UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROBERT COENE and VALERIE COENE,

                 Plaintiffs,

        v.

3M COMPANY, as Successor by merger
to Minnesota Mining & Manufacturing Company
and/or its predecessors/successors in interest,

                 Defendant.
_____

<u>DECISION & ORDER</u>

10-CV-6546G

## <u>PRELIMINARY STATEMENT</u>

      Plaintiffs Robert Coene ("Coene") and Valerie Coene have sued defendant 3M

Company ("3M") asserting a variety of state law claims sounding in products liability, breach of

warranty, negligence and fraud arising out of Coene's alleged occupational exposure to silica

dust during his employment.  (Docket # 1).  According to Coene, 3M designed and manufactured

respirators, which it distributed and sold to Coene's employer, Eastman Kodak Company

("Kodak").  (*Id.* at ¶ 19).  Coene contends that he used 3M respirators during his employment

and that the respirators failed to prevent his exposure to silica dust, causing him to develop

silicosis.  (*Id.* at ¶¶ 20-23).

      Currently pending before this Court are several motions filed by both parties.

First, 3M filed a motion to strike an opinion from Coene's exposure expert, William Meggs

("Meggs"), MD, PhD, on the grounds that the opinion was untimely.  (Docket # 62).  In

response, Coene filed a cross-motion seeking sanctions.[1]  (Docket # 63).  Also pending before the Court is 3M's motion to strike Coene's sur-replies.  (Docket # 84).

In addition, Coene has moved to preclude the testimony of 3M's toxicologist, John Whysner ("Whysner"), MD, PhD, on the grounds that he is not qualified to provide his opinion testimony and that his proposed testimony does not fit the facts of the case.  (Docket # 77).  The final motion pending before the Court is Coene's motion to extend the dispositive motion deadline.  (Docket # 103).

## I.  3M's Motions to Strike Meggs's Opinion and Coene's Sur-Replies and Coene's Motions for Sanctions and to Extend the Discovery Deadline

### A.  Factual Background

Resolution of several of the pending motions requires review of the chronology of various events occurring during the litigation of this lawsuit.  Accordingly, the Court will recite the relevant history of this litigation.

On November 18, 2011, 3M served its initial disclosures.  (Docket # 63-3).  In its disclosures, 3M identified one witness with potentially discoverable information.  (*Id.* at 2).  That witness was Alan R. Johnston.  (*Id.*).  In its disclosures, 3M noted that it was in the preliminary stages of identifying other individuals likely to have discoverable information and would supplement its disclosure.  (*Id.*).

On November 6, 2012, this Court issued an amended scheduling order that required, *inter alia*, Coene to identify his experts and to provide their expert reports on or before March 4, 2013.  (Docket # 47).  The order also required 3M to identify its experts and provide

---

[1]  Coene failed to file a notice of motion, and therefore the docket does not reflect that the sanctions motion is pending.

their reports on or before May 6, 2013.  (*Id.* at ¶ 2).  Expert discovery, including depositions, was to be completed by July 1, 2013.  (*Id.* at ¶¶ 1-2).

On March 4, 2013, Coene served his expert disclosure in accordance with the scheduling order.  (Docket # 67-2).  That disclosure, in relevant part, disclosed Meggs as an expert who would testify regarding Coene's "diagnosis of silicosis and its causes."  (*Id.* at 25).  According to the disclosure, Meggs would testify that the scarring in Coene's lungs was due to "occupational exposure to dusts while operating a laser sintering machine and/or abrasive blast cabinet at Eastman Kodak."  (*Id.*).  The disclosure further provided that Coene worked with a glass material that when heated transformed into respirable crystalline silica and that Coene may also have been exposed to crystalline silica when operating an "abrasive blast cabinet which may have used silica sand."  (*Id.*).

The disclosure also disclosed Katherine Root ("Root"), a senior industrial hygienist at Kodak.  (*Id.*).  According to the disclosure, Root was presently or previously a member of the industrial hygiene staff at Kodak who might testify regarding industrial hygiene reports and surveys performed at Kodak and the policies and procedures at Kodak for plant safety and enforcement of a respiratory protection program.  (*Id.*).

According to 3M, Coene failed to provide Meggs's expert report on March 4, 2013, in accordance with the scheduling order.  (Docket ## 62 at 2; 62-1 at 2, 4).  Instead, Coene produced Meggs's expert report on March 28, 2013.  (*Id.*).  In the report, Meggs opined that Coene was exposed to and inhaled silicon dioxide crystals, which caused silicosis.  (Docket # 62-1 at 4-6).  According to Meggs, the silicon dioxide crystals were formed when glass was heated during the laser sintering process.  (*Id.*).  Meggs's report does not mention the "abrasive blast cabinet."  (*Id.*).

On May 31, 2013, upon the joint proposal of the parties, this Court issued an amended scheduling order that required 3M to identify its experts and provide their written reports by June 20, 2013.  (Docket # 53).  In addition, the order provided that all fact discovery and expert discovery had to be completed by July 31, 2013.[2]  (*Id.*).  On June 19, 2013, 3M provided Coene the report of Whysner, its expert.  (Docket # 64 at ¶ 5).  On the seventeenth page of the report, Whysner stated that neither sand nor silica containing materials were used in the "sandblasting" process that Coene performed at Kodak.  (Docket # 64-3 at 18).  In a footnote to that statement, Whysner cited the affidavit of Root (hereinafter, the "Root Affidavit").  (*Id.*).  The Root Affidavit was not attached to Whysner's report, nor was it provided to Coene along with the report or included in the list of sources Whysner relied upon in forming his opinion.  (*Id.* at 4-5; Docket # 67 at 3-4).

On July 17, 2013, counsel for Coene contacted counsel for 3M via email to provide dates for the depositions of Meggs and Jeffrey Marshick ("Marshick"), MD, Coene's treating physician.  (Docket # 118-1 at 2-3).  In the email, counsel for Coene also indicated that he would need to "line up [3M's] guys as well" and that he needed to "take 3M's guys too." (*Id.*).  Counsel for 3M responded on July 31, 2013 to accept one of the proffered dates to depose Meggs.  (*Id.* at 1-2).  In the email, counsel for 3M also indicated that she would "be getting dates from Spencer and Weisler[3] and will provide you with their availability in the next day or two."

---

[2]  The scheduling order had been previously amended several times at the request of the parties.  The original scheduling order issued by the Court and subsequent amendments provided for fact discovery to close prior to expert discovery.  (Docket # 34 at ¶¶ 4-5).  The May 31, 2013 scheduling order was drafted by the parties and required expert discovery and fact discovery to be completed by the same date.  (Docket # 53).  All scheduling orders issued after that date provided for expert discovery and fact discovery to be completed simultaneously. (Docket ## 56, 58).

[3]  It is not clear whether this was a typographical error and should have read "Whysner."  The subsequent email communications relate to the scheduling of Spencer and Whysner.  There is no other reference to "Weisler" in the submissions filed with the Court.

(*Id.*).  Counsel for 3M provided counsel for Coene with available dates for the depositions of

Spencer and Whysner on August 1, 2013.  (*Id.* at 1).

On August 19, 2013, this Court issued an Amended Scheduling Order setting

October 15, 2013 as the deadline for completion of fact and expert discovery.  (Docket # 58).  In

addition, the order provided November 15, 2013 as the deadline for filing dispositive motions.

(*Id.*).  The order provided that any request for an extension must be made "by written

application, made prior to the cutoff date, showing good cause for the extension."  (*Id.*).  On

August 21, 2013, Meggs was deposed by counsel for 3M.  (Docket # 64-2 at 2).  During his

deposition, Meggs testified that he had completed his review of the relevant records and

literature and that he was not aware of and had not requested any additional information

necessary to render his opinion.  (Docket # 62-1 at 12).  According to Meggs, Coene was

exposed to amorphous silica when he was employed at Kodak.  (*Id.* at 10).  Meggs testified that

the amorphous silica was created when glass, which contained crystalline silica, was manipulated

through laser sintering, heating and sandblasting.  (Docket ## 62-1 at 10; 64-2 at 9-10; 75-1 at

2-3, 5-6, 8-9).  Meggs testified that he had not reviewed any documents from Kodak and

specifically had not reviewed "an affidavit from a Kodak Industrial Hygienist that said [Kodak]

didn't have any silica in Mr. Coene's workplace."  (Docket # 64-2 at 6).  In addition, Meggs

agreed with 3M's attorney that all of his opinions concerning Coene were discussed during the

course of the deposition.  (Docket # 62-1 at 14).

On August 27, 2013, Coene took the deposition of Whysner.  (Docket # 63-1 at

1).  During the deposition, 3M provided Whysner's entire file to Coene, including the Root

Affidavit.  (Docket # 64 at ¶ 9).  During the deposition, the Root Affidavit was marked as an

exhibit, and Coene's attorney questioned Whysner about the affidavit.  (Docket # 84-8 at 3-4).

The Root Affidavit was executed on June 24, 2013 and states, in relevant part, "[c]rystalline silica was not used in the Plastic Fabrication, the Model Shop and the Rapid Prototype Center at the Elmgrove Plant, B-4, which are the areas in which [Coene] worked while employed at Kodak."  (Docket # 63-2 at 1).

According to 3M, on September 19, 2013, Coene's attorney forwarded to 3M's counsel a letter written by Meggs dated September 17, 2013 (hereinafter, the "Second Meggs Report").  (Docket ## 62 at 3; 62-1 at 16-17).  The letter was written by Meggs "in follow-up to [his] report and earlier deposition" and "[i]n light of the questioning by defense counsel regarding current studies relating to occupational disease in laser sintering."  (Docket # 62-1 at 16).  In the letter, Meggs states that upon review of Coene's deposition[4] and two articles published in 1997 and 1999, he believed that Coene was also exposed to nylon and resin dust while working at Kodak.  (*Id.*).  Meggs opined that "nylon and resin dust powder was a contributing factor to [Coene's] interstitial fibrosis."  (*Id.* at 17).

On September 24, 2013, 3M's counsel informed counsel for Coene that 3M considered the Second Meggs Report to be an improper attempt to alter Meggs's expert opinion and requested that it be withdrawn.  (Docket # 64-6 at 2).  In addition, counsel for 3M stated that if the report was not withdrawn by September 25, 2013, the upcoming depositions of plaintiff's treating physician, Marshick, and John Spencer ("Spencer"), CIH, CSP, one of 3M's expert witnesses, would be adjourned.  (*Id.* at 2-4; Docket # 62 at 3).

In response, counsel for Coene stated that after he received and reviewed a copy of the transcript for Whysner's deposition, he gave Meggs a copy of the Root Affidavit.  (Docket # 63-1).  Counsel for Coene contended that the Root Affidavit is "obviously a very important item of evidence" that "may remove the possibility that silica sand was used in the blast cabinet

---

[4]  Meggs had reviewed Coene's deposition in connection with his original report.  (Docket # 100-2 at 2).

at Kodak." (*Id.*).  According to Coene's counsel, the affidavit was signed by an individual who was not disclosed in 3M's disclosures.  (*Id.*).  After reviewing the Root Affidavit, Meggs "decided to do additional research on other exposures" and provided a supplemental report. (*Id.*).

On September 25, 2013, 3M filed its pending motion to strike the Second Meggs Report and for a protective order seeking to adjourn the depositions of Marshick and Spencer, which were scheduled to proceed on September 27, 2013.  (Docket # 62).  The Court adjourned the depositions pending resolution of the motion to strike.[5]  On September 26, 2013, Coene opposed the motion to strike and cross-moved for sanctions based upon 3M's failure to supplement its initial disclosures to identify Root as a potential witness.  (Docket # 63).  Coene did not file a notice of motion in connection with his cross-motion.  Accordingly, the docket does not reflect a pending motion for sanctions, and the Court did not issue a motion scheduling order with respect to the cross-motion.

On September 27, 2013, 3M filed a reply in further support of its motion to strike and in response to Coene's cross-motion for sanctions.  (Docket # 64).  On September 30, 2013, Coene filed a response to 3M's reply.  (Docket # 67).  At the end of the response, Coene requested that the Court extend the discovery deadlines in order to permit the parties to complete depositions of treating physicians, expert witnesses or other witnesses.  (*Id.* at 5).  On October 15, 2013, Coene filed a supplemental response to 3M's reply.  (Docket # 75).  This filing prompted 3M's motion to strike Coene's September 30, 2013 and October 15, 2013 filings on the grounds that they were not authorized under the applicable rules and because Coene had not sought leave of the Court before filing them.  (Docket # 84).  In October 2013, Coene and 3M

---

[5]  By letter dated January 23, 2014, counsel for Coene stated that he received a phone call from the Court on September 26, 2013, informing him that the depositions were adjourned pending resolution of the pending motion.

each filed motions for summary judgment.  (Docket ## 68, 71).  Finally, on November 13, 2013,

Coene filed the pending motion seeking an extension of the dispositive motion deadline.

(Docket # 103).

      The Court held oral argument on several of the motions on October 29, 2013.

(Docket # 99).  During oral argument, the Court requested that 3M's attorney submit an affidavit

providing a timeline of her efforts to obtain the Root Affidavit.  (Docket # 102 at 16-17, 59-60).

On October 29, 2013, that affidavit was provided to the Court.  (Docket # 94-2).

      According to the affidavit, counsel for 3M contacted outside counsel for Kodak in

early February 2013 and requested an affidavit from Kodak for use in connection with an

anticipated summary judgment motion attesting that crystalline silica was not used at Kodak

while Coene was employed there.  (*Id.* at ¶¶ 4-5).  On February 5, 2013, counsel for 3M received

a draft affidavit from Kodak's outside counsel.  (*Id.* at ¶ 6).  Kodak's outside counsel indicated to

counsel for 3M that the affidavit was a draft and had not been approved by Kodak's legal

department, which was required to finalize the affidavit for use in connection with its summary

judgment motion.  (*Id.*).

      On March 25, 2013, 3M's counsel communicated with Kodak's outside counsel

for the purpose of informing Kodak's outside counsel that 3M was not yet ready to file a

summary judgment motion.  (*Id.* at ¶ 7).  3M's counsel contacted Kodak's outside counsel on

June 17, 2013, and requested permission to use the draft affidavit.  (*Id.* at ¶ 8).  Kodak's outside

counsel indicated that the affidavit needed to be reviewed and approved by Kodak.  (*Id.*).  On

June 24, 2013, Kodak's outside counsel forwarded counsel for 3M a scanned copy of the

executed affidavit.  (*Id.* at ¶ 9).  Counsel for 3M represented that she has never communicated

with Root, did not select Root as the affiant and did not participate in the drafting or revising of the affidavit.  (*Id.* at ¶ 10).

After the oral argument on October 29, 2013, counsel for Coene sent two letters to the Court, one dated October 30, 2013, and the other dated November 1, 2013, each of which sought to supplement the record before the Court.  By this Court's count, these letters are Coene's third and fourth sur-replies.

**B.**     **3M's Motion to Strike Coene's Sur-Replies**

I turn first to 3M's motion to strike the two sur-replies filed by Coene or, in the alternative, for leave to file a rebuttal to Coene's sur-replies.  (Docket # 84).  Rule 7 of the Local Rules of Civil Procedure for the Western District of New York governs motion practice.  *See* W.D.N.Y. Local Rule 7.  That rule contemplates the filing of an initial motion, the non-movant's response and, if specifically requested in the notice of motion, a reply by the moving party.  *See id.*  The rule specifically prohibits the filing of a sur-reply without leave of the Court.  *See* W.D.N.Y. Local Rule 7(a)(6).  This Court's customary practice is to issue a motion scheduling order after a motion is filed providing deadlines for these filings.  In this case, however, the parties filed their response and reply within a matter of days, before the Court issued a scheduling order to govern the briefing.  (Docket ## 62, 63, 64, 66).

After the matter was fully briefed, and without seeking leave of the Court, on September 30, 2013, Coene filed a document purporting to be his response to 3M's reply.[6] (Docket # 67).  On October 15, 2013, again without seeking leave of the Court, Coene filed a document purporting to be a supplemental response to 3M's reply.  (Docket # 75).  In fact,

---

[6]  Coene's response to the motion purportedly contained a "cross-motion" seeking discovery sanctions. (Docket # 63).  Thus, Coene's first sur-reply theoretically could be a reply to 3M's opposition to Coene's motion for sanctions.  Yet, Coene's cross-motion did not contain a notice of motion, in violation of Local Rule 7(a)(1).  Nor did Coene request the opportunity to serve reply papers.  Accordingly, Coene's September 30, 2013 filing is an improper sur-reply.

Coene's September and October filings were not Coene's only attempts to improperly supplement the record on this motion. As recounted above, Coene sent two letters to this Court seeking to supplement the record after oral argument.

This Court has spent an inordinate amount of time reviewing the various filings, including the improperly filed sur-replies. Having expended judicial time and resources doing so, this Court will exercise its discretion to consider the information contained in the two sur-replies (Docket ## 67, 75) and in 3M's rebuttal (Docket # 84). *See Navarrete De Pedrero v. Schweizer Aircraft Corp.*, 635 F. Supp. 2d 251, 258-59 (W.D.N.Y. 2009) ("[m]otions for leave to file sur-reply information and to strike are subject to the sound discretion of the court"). The Court will not consider, however, the letters submitted by Coene following the oral argument on the motion. Coene's counsel is cautioned to comply with the district's local rules and reminded that any future violations may result in sanctions.

C.     **3M's Motion to Strike the Second Meggs Report**

1.     **The Parties' Positions**

I turn next to 3M's motion to strike the Second Meggs Report. 3M contends that the Second Meggs Report contains a new opinion that was not timely disclosed in accordance with this Court's scheduling order setting a deadline of March 4, 2013 for Coene's expert disclosures. (Docket # 62 at 1-2). According to 3M, Meggs previously opined that Coene was exposed to silica while working at Kodak and now suffers from silicosis. (*Id.* at 5). Meggs opined that the respirable silica was created during the laser sintering process involving glass material. (*Id.*). 3M maintains that Meggs's deposition testimony was consistent with his report and that Meggs testified that he did not have any other opinions concerning Coene. (*Id.*)

According to 3M, the Second Meggs Report opines, for the first time, that Coene was also exposed to nylon and resin and that Coene suffers from interstitial fibrosis, not silicosis. (*Id.*).  3M contends that Meggs's new opinion cannot be characterized as either a supplemental opinion or a rebuttal opinion.  (*Id.* at 6-8).  Specifically, it is not a supplemental opinion because it is not based upon any new information; rather, it relies upon information, including Coene's deposition testimony and scientific articles, that predate the issuance of Meggs's original report. (*Id.* at 6).  3M further maintains that the report is not a rebuttal report because it was not filed within the thirty-day deadline provided by Rule 26(a)(2)(D) of the Federal Rules of Civil Procedure and, in any event, does not concern the same subject matter of any of 3M's expert opinions.  (*Id.* at 6-7).

3M contends that it will suffer prejudice if Meggs is permitted to testify about the opinion contained in his second report.  (*Id.* at 8-9).  As 3M argues, it has conducted discovery based upon Coene's assertions that he was exposed to silica and that he suffered from silicosis. (*Id.*).  According to 3M, it has not prepared to defend against a claim of "interstitial fibrosis" caused by exposure to nylon and resin and would have to "redo" much of its preparation in order to do so.  (*Id.*).  In addition, 3M has already deposed Meggs and has not had an opportunity to examine him on his new opinion.  (*Id.*).

Coene responds that the Second Meggs Report is a permissible supplemental report within the meaning of Rule 26(e)(2).  (Docket # 63 at 4-5).  According to Coene, 3M wrongfully withheld the Root Affidavit and failed to supplement its initial disclosures to identify Root as a witness upon whom it would rely to support its defense.  (*Id.*).  Coene contends that the information contained in the Root Affidavit suggests that silica sand was not used in the sandblasting process at Kodak.  (*Id.* at 3).  In his original report, Meggs opined that Coene was

exposed to silica during the sandblasting process; thus, the information in the Root Affidavit directly challenges Meggs's opinion.  (*Id.* at 3 n.1).  According to Coene, the newly-disclosed information in the Root Affidavit led Meggs to consider whether any other dusts at Kodak could have caused Coene's injuries.  (*Id.* at 3).  In other words, Coene maintains, the late disclosure of the new information justifies Meggs's supplemental opinion.  (*Id.*).

In reply, 3M contends that the Root Affidavit did not communicate any new information to Coene.  (Docket # 64 at 5).  According to 3M, the Root Affidavit merely confirmed information that Meggs already knew – that there was no evidence that crystalline silica was used at Kodak while Coene worked there.  (*Id.* at 4).  Specifically, 3M notes that Meggs testified during his deposition that he had not reviewed any records from Kodak suggesting that crystalline silica was present in Coene's workplace.  (*Id.* at 5).  Indeed, Coene testified during his deposition that he did not believe that the materials he worked with contained crystalline silica in their native form, but that respirable silica was produced after the materials were heated, causing the amorphous silica to crystallize.  (*Id.* at 6).

3M argues that the absence of any evidence suggesting the presence of native crystalline silica at Kodak was the factual premise underlying Meggs's original report.  (*Id.* at 7).  According to 3M, in order to establish Coene's exposure to silica in a respirable form, Meggs opined that the respirable (or crystalline) silica was created during the laser sintering process performed by Coene.  (*Id.*).  According to 3M, although Meggs testified about Coene's exposure during the sandblasting process, Meggs did not opine that native crystalline silica was used in that process; instead, Meggs testified that Coene's exposure occurred when the crystalline silica that was created during the laser sintering process was disturbed during the sandblasting process. (*Id.*).

In any event, 3M maintains that Coene was informed of the existence of the Root Affidavit as early as June 19, 2013, when Whysner's report, referring to the Root Affidavit, was turned over.  (*Id.* at 3).  According to 3M, Coene never requested a copy of the affidavit.  (*Id.*).  Further, 3M contends that Meggs was questioned about the Root Affidavit during his deposition, and Coene still did not request a copy of it.  (*Id.*).  During Whysner's deposition on August 27, 2013, counsel for Coene was provided a copy of the Root Affidavit and questioned Whysner about its contents.  (*Id.*).  Yet, 3M argues, only after Whysner was deposed and "discredited" Meggs's theory did Meggs offer the new theory of exposure involving inhalation of nylon and resin.  (*Id.* at 4).  3M contends that Meggs possessed information relating to nylon and resin prior to his original report and thus could have timely provided his nylon and resin exposure opinions, irrespective of the Root Affidavit.  (*Id.* at 8).

In his first sur-reply, Coene argues that discovery has not concluded and that 3M has failed to depose his treating physicians, who have independent opinions of the cause of Coene's silicosis.  (Docket # 67 at 1-3).  According to Coene, once those depositions are completed, both Meggs and 3M's experts would be permitted to consider the opinions of the treating physicians in connection with their own opinions.  (*Id.*).  In addition, Coene contends that he has always maintained that the sandblasting cabinet was a source of his silica exposure and that the Root Affidavit provided new information relevant to that theory of exposure.  (*Id.* at 3-4).  For these reasons, Coene maintains, Meggs was entitled to supplement his report.  (*Id.*).

In his second sur-reply, Coene argues that Meggs is an important witness, a factor weighing against preclusion of his opinion.  (Docket # 75 at 1-2).  Coene also disputes that 3M will be prejudiced, noting that discovery is ongoing and a trial date has not yet been set.  (*Id.* at 3-4).  In addition, Coene maintains that 3M mischaracterizes Meggs's deposition testimony and

13

that Meggs testified repeatedly about Coene's exposure through the sandblasting process.  (*Id.* at 4-5).

In rebuttal, 3M contends that Meggs is Coene's only exposure expert and that the treating physicians will be unable to offer opinions regarding Coene's workplace exposure. (Docket # 84 at 5-6).  In other words, although the treating physicians may have differing opinions as to Coene's diagnosis, they will not be able to opine as to whether and how Coene was exposed to substances in the workplace.  (*Id.*).  3M contends that it relied upon Meggs's original exposure theory in preparing its defense and will be prejudiced by a change in that theory at this stage; the fact that discovery was not closed at the time Coene disclosed the Second Meggs Report is irrelevant.  (*Id.*).  3M further notes that Coene disclosed Root as a potential witness on March 4, 2013, in his expert disclosure, and thus it is "preposterous" for Coene to argue that he was unaware of Root.  (*Id.* at 7-8).

In addition, 3M continues to maintain that Meggs's testimony demonstrates that he did not believe that native crystalline silica was used in the sandblasting process.  (*Id.* at 9). Instead, according to 3M, Meggs testified that crystalline silica was created during the laser sintering process and that Coene was exposed to the created crystalline silica when he disturbed it during the sandblasting process.  (*Id.*).

2.    **Analysis**

Rule 26(a)(2)(B)(i) of the Federal Rules of Civil Procedure provides that a written expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i).  "It should be assumed that at the time an expert issues his report, that report reflects his full knowledge and complete opinions on the issues for which his opinion has been sought."  *Innis Arden Golf Club v. Pitney Bowes, Inc.*,

2009 WL 5873112, *3 (D. Conn. 2009) (quotation omitted).  Parties are required to make their expert disclosures "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  In addition, parties have thirty days after another party's expert disclosure to produce any expert evidence "intended solely to contradict or rebut evidence on the same subject matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii).

Rule 26 also imposes an affirmative duty to supplement an expert report "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(a)(2)(E) and 26(e)(1)(A).  Supplemental reports must be provided at the same time that a party's pretrial disclosures are due.  Fed. R. Civ. P. 26(e)(2).

"The duty to supplement arises when the expert subsequently learns of information that was previously unknown or unavailable, and the new information renders the earlier report incomplete or inaccurate."  *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 705 (S.D.N.Y. 2011) (citing Fed. R. Civ. P. 26(e)).  The rule does not, however, permit a party to supplement an expert report at any time it wishes, "but instead imposes an obligation to supplement the report when a party discovers the information that it has disclosed is incomplete or incorrect."  *Id.* (quoting *Coles v. Perry*, 217 F.R.D. 1, 3 (D.D.C. 2003)).

"Although Rule 26(e) 'does not itself define the word supplement[,] . . . common sense suggests (and numerous decisions confirm) that an expert report that discloses new opinions is in no way a mere supplement to a prior report.'"  *Stuhlmacher v. Home Depot USA, Inc.*, 2012 WL 5866297, *3 (N.D. Ind. 2012) (quoting *Trinity Homes, LLC v. Ohio Cas. Ins. Co. Grp.*, 2011 WL 2261297, *3 (S.D. Ind. 2011)).  To interpret Rule 26(e)'s supplementation

provision more broadly, particularly by permitting supplementation whenever a party seeks to bolster its expert, "would [wreak] havoc [on] docket control and amount to unlimited expert opinion preparation." *Lewis v. FMC Corp.*, 786 F. Supp. 2d at 705 (alterations in original) (quoting *Akeva LLC v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002)).

Rule 37(c)(1) provides that if a party fails to disclose information "as required by Rule 26(a) or (e), the party is not allowed to use that information . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The party seeking Rule 37 sanctions bears the burden of showing that the opposing party failed to timely disclose information. *See Lodge v. United Homes, LLC*, 787 F. Supp. 2d 247, 258 (E.D.N.Y. 2011). "Rule 37(c)(1)'s preclusionary sanction is automatic absent a determination of either substantial justification or harmlessness." *Innis v. Arden Golf Club v. Pitney Bowes, Inc.*, 2009 WL 5873112 at *2. The purpose of this rule is "to prevent the practice of 'sandbagging' an adversary with new evidence." *See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012) ("*Ritchie Risk*") (quoting *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004)).

As an alternative to preclusion, the rule also affords the court discretion to impose lesser sanctions, such as monetary sanctions or an adverse jury instruction, "in addition to or instead of this sanction." Fed. R. Civ. P. 37(c)(1); *Ritchie Risk*, 280 F.R.D. at 156 ("imposition of the preclusion sanction remains within the trial court's discretion"). Indeed, the Second Circuit has counseled district courts to consider lesser sanctions prior to precluding evidence as a sanction for discovery violations. *See Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir. 1988) ("[b]efore the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties the violation causes, and must consider less

drastic responses"); *Hunt v. CNH Am. LLC*, 857 F. Supp. 2d 320, 340 (W.D.N.Y. 2012) (noting that courts should consider lesser sanctions before precluding a new expert opinion disclosed after discovery deadline in violation of Rule 26(a)(2)(B)), *aff'd*, 511 F. App'x 43 (2d Cir. 2013).

### a.   Coene's Violation of Rule 26(a)

I must first determine whether the Second Meggs Report may properly be characterized as a supplemental report and is therefore timely under Rule 26(e), or whether it is properly characterized as a new opinion and is therefore untimely under Rule 26(a)(2)(D). Coene argues that the Second Meggs Report is a supplemental report based upon new information contained in the Root Affidavit.[7]   Coene's contention is belied by the record.

The Second Meggs Report neither states nor suggests that it was prompted by previously unknown information or by reliance upon any of the information contained in the Root Affidavit.  Instead, it simply states that Meggs's new opinion was "in follow-up to my report and earlier deposition[;] . . . [i]n light of questioning by defense counsel regarding current studies relating to occupational disease in laser sintering."  (Docket # 62-1 at 16).  According to Meggs, although there are no published articles addressing occupational disease in laser sintering, there were "studies illustrating a new occupational lung disease resulting from exposure to nylon dust."  (*Id.*).  According to the report, Meggs formed his opinion that Coene was exposed to nylon and resin dust after reviewing Coene's deposition testimony and two articles that were published in the late 1990s.  (*Id.*).  Of course, these materials were available to Coene prior to his initial report in March 2013.  *See Levinson v. Westport Nat'l Bank*, 2013 WL 3280013, *5 (D. Conn. 2013) ("[t]here is no evidence that the information [the expert] added was previously unknown or unavailable to him[;] . . . the failure to include in his original report

---

[7]   3M argues that the Second Meggs Report is not properly classified as a rebuttal report.  Coene does not contend that the Second Meggs Report was a rebuttal to any of 3M's experts, and thus this Court need not address 3M's argument.

discussions of regulations, statutes and regulatory guidance that are publically available cannot be substantially justified"); *Stuhlmacher v. Home Depot USA, Inc.*, 2012 WL 5866297 at *3 (second report was a new opinion and not a supplemental report where "[t]he information on which [the expert] based his opinions was available prior to the defendants deposing him"); *Lewis*, 786 F. Supp. 2d at 705 ("[the expert] does not attest that the historical documents and data appended to his declaration were unknown or unavailable to him when he prepared his initial report and subsequent supplementations").

In addition, the opinion contained in the Second Meggs Report presents potentially new causes for Coene's injuries. Meggs's original report opined that Coene was exposed to respirable silica that caused his lung disease. His second report contends that the work environment also exposed him to other dangerous dusts, including nylon and resin, which contributed to his lung injuries. (Docket # 62-1 at 16-17). Accordingly, the Second Meggs Report does not supplement or correct his previous theories, but instead constitutes a new opinion concerning additional causes of Coene's injuries. *See Stuhlmacher*, 2012 WL 5866297 at *3 (concluding that second report was new opinion, not a supplemental report; "[the expert's] report does not correct or enhance his pre-existing theory[,] [r]ather, it puts forth a new potential cause for the incident"); *Lewis*, 786 F. Supp. 2d at 690 ("[t]o the extent [the expert's] declaration presents 'additional' and 'new' evidence and opinions[,] . . . the declaration cannot be construed as a supplemental report under Fed. R. Civ. P. 26(e)"); *Innis*, 2009 WL 5873112 at *3 (second report was not supplemental report where it included an "additional opinion and the bases therefore").

Finally, Coene's litigation actions in response to 3M's disclosure of the existence of and the information contained in the Root Affidavit suggest that the information was not the

impetus for Meggs's new opinion.  First, as early as March 4, 2013, Coene himself listed Root in

his expert disclosures.  On June 19, 2013, 3M disclosed Whysner's report stating that

"sandblasting is a misnomer because sand or any silica containing material was not used in this

process."  (Docket # 64-3 at 18).  In support of that assertion, Whysner cited the Root Affidavit.

(*Id.*).  Upon receipt of Whysner's report, Coene did not request a copy of the Root Affidavit, nor

did he ask Meggs to reevaluate his opinion in light of Whysner's statement that silica was not

used in the sandblasting process.  During oral argument, the Court asked counsel for Coene

whether there was any additional information contained in the Root Affidavit that was not

conveyed by the statement contained in the Whysner report.  Counsel for Coene did not identify

anything.  (Docket # 102 at 34-36).

Instead, Coene contended that had he known that Root not only existed but also

had relevant information, he would have sought to depose her before proceeding with Meggs's

deposition.  (*Id.* at 33).  According to Coene, an industrial hygienist is a critical witness who

could have "valuable information."  (*Id.* at 42).  Yet, Meggs was asked during his deposition

whether he had reviewed an affidavit from a Kodak industrial hygienist.  This question evidently

did not prompt Meggs or Coene's counsel to request a copy of the affidavit, an adjournment of

the deposition or Root's contact information in order to subpoena her for deposition.  Indeed, by

October 29, 2013, the day the pending motion was argued before the Court, Coene still had made

no attempts to secure Root's deposition.  (*Id.* at 44-48).

Finally, there is no indication that Coene was surprised by the information

contained in the Root Affidavit when counsel reviewed it during Whysner's deposition.  Counsel

did not seek to adjourn the deposition to consider the information in the affidavit; instead,

Coene's counsel questioned Whysner about the affidavit's contents.  At the time, counsel for

Coene did not indicate that he thought the information was new or would require additional expert discovery; nor did he reserve any rights with respect to the late disclosure of the affidavit. Instead, counsel for Coene waited until after he received the transcript from Whysner's deposition and only then provided Meggs with the Root Affidavit and asked him to reevaluate his opinion assuming that no native respirable silica was used at Kodak.  In sum, counsel's conduct significantly undercuts Coene's arguments that the information in Root's Affidavit prompted the second report.  For these reasons, I conclude that the Second Meggs Report contains a new opinion and is not merely a supplement to his previous opinion.  Accordingly, the second report was not timely disclosed by the deadline set forth in this Court's scheduling order, as required pursuant to Rule 26(a)(2)(D).

### b.        Substantial Justification and Harmlessness

Courts should not impose sanctions under Rule 37(c)(1) "where a party's failure to comply" with Rule 26(a) or (e) "was 'substantially justified' or where the conduct was 'harmless.'"  *Ritchie Risk*, 280 F.R.D. at 158-59.  "Substantial justification means justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request."  *Kunstler v. City of New York*, 242 F.R.D. 261, 264-65 (S.D.N.Y. 2007) (internal quotations and citations omitted).  "Harmlessness means an absence of prejudice."  *Ritchie Risk*, 280 F.R.D. at 159.  The party that failed to comply with its discovery obligations bears the burden of proving that its failure was both substantially justified and harmless.  *Id.*

Here, Coene's only proffered justification is that the tardily disclosed Root Affidavit prompted the Second Meggs Report.  Having rejected that justification, I likewise

conclude that the failure to timely disclose Meggs's nylon and resin exposure opinion was not substantially justified.

Coene also has not satisfied his burden of demonstrating that his untimely disclosure was harmless.  The new opinion was disclosed after Whysner had prepared his report and after both Meggs and Whysner were deposed.  Thus, Whysner did not have the opportunity to address the opinion in his report or during his deposition, and 3M has not had an opportunity to depose Meggs concerning his new opinions.  In addition, the introduction of new causes for Coene's injuries may require additional, possibly time consuming and expensive, fact discovery that was not previously explored by 3M in order to defend against the claim.

### c.      __Appropriate Sanction__

The decision whether to issue a preclusion order, or a lesser sanction, is within the discretion of the trial court.  *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297-98 (2d Cir. 2006).  "[P]reclusion of evidence is a harsh remedy, [and] it should be imposed only in rare situations."  *Ritchie Risk*, 280 F.R.D. at 156-57 (internal citations and quotations omitted).  In determining whether preclusion or another sanction is appropriate, a court should consider: "(1) the proponent's explanation for failing to provide the subject evidence; (2) the importance of such evidence to the proponent's case; (3) the opponent's time needed to prepare to meet the evidence; and (4) the possibility of obtaining a continuance to permit the opponent to meet the evidence."  *Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 229 (W.D.N.Y. 2011) (citing *Outley v. City of New York*, 837 F.2d at 589).  "While a showing of 'bad faith' is not required for preclusion to be ordered under Rule 37(c), a party's bad faith 'can be taken into account' by the [c]ourt in considering the party's explanation for its failure to satisfy its discovery obligations." *Ritchie Risk*, 280 F.R.D. at 157 (quoting *Design Strategy, Inc. v. Davis*, 469 F.3d at 296).

Although Coene failed without substantial justification to comply with his discovery obligations, consideration of the above four factors leads me to conclude that preclusion is too harsh a sanction for his conduct.[8]  First, nothing in the record suggests that Coene's conduct involved bad faith.  Second, Meggs's opinion may be critical to Coene's ability to establish that he was exposed to harmful substances while employed by Kodak.  Although Coene contends that he can establish exposure through the testimony of his treating physicians, 3M has taken the position that Meggs's testimony is critical to Coene's ability to establish causation.  (Docket # 84 at 5) ("Meggs is the only expert designated to testify on [Coene's] theory of ***exposure***, a necessary prerequisite to any causation proof.  Although [Coene] designated several treating physicians who may testify that silicosis is the cause of [Coene's] medical symptoms[,] . . . they designated only [Meggs] to testify about *how [Coene] was allegedly exposed to silica*.").

Although 3M has been prejudiced by Coene's failure to timely disclose Meggs's nylon and resin exposure opinions, 3M's conduct in this litigation is not without fault.  As discussed in greater detail below, 3M violated Rule 26(e) by failing to timely inform Coene that it would be relying on testimony from Root in support of Whysner's opinion.  Although I ultimately conclude that such failure was harmless, 3M's failure to promptly notify Coene of Root has nonetheless unnecessarily complicated resolution of the issues surrounding the Second Meggs Report.

Finally, although fact and expert discovery closed during the pendency of the motions, Coene did disclose Meggs's new opinions before that occurred and well in advance of

---

[8]  In reaching this determination, the Court is not addressing or determining whether the Second Meggs Report is otherwise admissible under Federal Rule of Evidence 702 or whether Coene should be permitted to proceed to trial on claims of exposure to nylon or resin dust without seeking leave to amend his complaint.  Those issues are not raised in any motions pending before this Court.

any trial of this matter.  Indeed, no trial date has been set, and the pending summary judgment motions have not yet been decided by the district court.  Thus, a continuance to allow 3M time to conduct limited discovery related to the new opinion and to supplement its expert report is not unreasonable.  *See Safespan Platform Sys., Inc. v. EZ Access, Inc.*, 2011 WL 7473467, *4 (W.D.N.Y. 2011) ("unlike the cases cited by defendants, this discovery issue did not arise at the eve of trial or present a novel theory late in the proceedings"), *report and recommendation adopted*, 2012 WL 777305 (W.D.N.Y. 2012); *see also Boyde v. Monroe Cnty.*, 2011 WL 4457668, *4 (W.D.N.Y. 2011) (preclusion not appropriate sanction where court could grant a continuance by reopening discovery).

Although I find that Coene's discovery failures do not warrant an order of preclusion, they do justify the reopening of the discovery period to allow 3M to conduct additional discovery relating to the untimely disclosure, *see Boyde v. Monroe Cnty.*, 2011 WL 4457668 at *4, and the imposition of fee shifting for any supplemental expert reports and discovery, *see Ritchie Risk*, 280 F.R.D. at 157 (where a party's failure to comply with its discovery obligations causes an opposing party to incur additional expenses, those expenses may properly be shifted to the non-compliant party).

For the reasons set forth above, I direct that:

(1)    the parties confer regarding 3M's additional discovery and 3M's supplemental expert reports and jointly propose to this Court by no later than **fourteen (14) days from the entry of this Decision and Order** an amended scheduling order setting deadlines for such fact and expert discovery; and

(2)    Coene pay 3M's expert's fees and expert's costs resulting from the additional discovery and supplemental reports.

D.     Coene's "Cross-Motion" for Sanctions

Coene contends that 3M's failure to supplement its initial disclosures to identify Root as a witness upon which 3M would rely to support its defense was a violation of 3M's duty to supplement under Rule 26(e) of the Federal Rules of Civil Procedure.  (Docket # 63 at 3).  In addition, Coene contends that 3M violated Rule 26(e) by failing to timely produce Root's affidavit.  (*Id.* at 4).

According to Coene, 3M intentionally concealed the Root Affidavit and failed to produce it before Meggs's deposition.  Further, Coene maintains, after disclosing the Root Affidavit, 3M sought to strike Coene's expert report that was supplemented upon receipt of the Root Affidavit.  (*Id.*).  Coene contends that 3M's reference to the Root Affidavit in Whysner's report was insufficient to put him on notice that Root was an individual with relevant information.  (Docket # 67 at 4).  Instead, Coene maintains, 3M should have supplemented its initial disclosures to identify Root and provided contact information so that Coene could have subpoenaed her for deposition.  (Docket ## 63 at 4; 75 at 5).

In addition, according to Coene, 3M sought to adjourn the scheduled depositions of Marshick and Spencer in connection with its motion to strike.  (Docket # 63 at 5).  According to Coene, the adjournment of the depositions was a direct result of 3M's failure to timely disclose the Root Affidavit and to supplement its initial disclosures.  (*Id.* at 5-6).  Accordingly, Coene seeks monetary sanctions for costs incurred by Coene as a result of the adjournment of the depositions and accompanying attorney's fees.  (*Id.*).

In response, 3M contends that it complied with its disclosure obligations by producing a copy of the Root Affidavit, which was referenced in Whysner's report, during Whysner's deposition, in accordance with Rule 26(a)(2)(B) of the Federal Rules of Civil

Procedure.  (Docket # 64 at 8-9).  According to 3M, such disclosure was sufficient to place Coene on notice that 3M would be relying upon Root; thus, its reliance on Root was otherwise made known to Coene during the discovery process in accordance with Rule 26(e).  (*Id.*; Docket # 84 at 7-8).  In addition, 3M contends that it obtained the affidavit from Kodak, a third party to the litigation, and nothing precluded Coene from seeking discovery from Kodak on his own. (Docket # 64 at 9).

Further, 3M maintains that even if it technically violated its disclosure obligations by not supplementing its Rule 26 disclosures to identify Root, such failure was both harmless and substantially justified.  (*Id.* at 9-10).  First, 3M maintains that its disclosure of the Root Affidavit was the functional equivalent of supplementing its initial disclosures to identify Root as a witness.  In any event, the failure was harmless because the affidavit was ultimately provided to Coene and caused no prejudice because it did not contain information of which Coene was previously unaware.  (*Id.*).  Further, 3M contends that Coene was fully aware of Root, as evidenced by Coene's identification of Root in his own expert disclosures dated March 4, 2013.  (Docket # 84 at 8).

Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure requires a party to disclose witnesses whom "the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A).  In addition, Rule 26(e) requires a party to supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e).

The purpose of the witness identification requirement of Rule 26(a) "is to alert an opposing party of the need to take discovery of the named witness." *Degelman Indus. Ltd. v. Pro-Tech Welding & Fabrication, Inc.*, 2011 WL 6754059, *2 (W.D.N.Y.) (internal quotations omitted), *report and recommendation adopted*, 2011 WL 6752565 (W.D.N.Y. 2011).   A party's mere knowledge of the existence of a witness is insufficient to alert the party that the opposing party might call the witness in support of their claims or defenses.  *Id.*  Thus, "the mere mention of a name in a deposition or interrogatory response is insufficient to satisfy Rule 26(a)."  *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 72 (E.D.N.Y. 2012).  Instead, "to satisfy Rule 26, parties must make an unequivocal statement that they may rely upon an individual on a motion or at trial.  *Id.* at 73.

As discussed above, the Court has broad discretion under Rule 37(c)(1) to sanction a party's failure to comply with Rule 26(a) or (e).  Fed. R. Civ. P. 37(c)(1).  The Court should impose sanctions for a party's failure to comply with disclosure obligations, including but not limited to preclusion, "unless the failure was substantially justified or is harmless."[9]  Fed. R. Civ. P. 37(c)(1).

The parties do not dispute that 3M failed to supplement its Rule 26 disclosures to include Root among the list of potential witnesses upon whom 3M may rely to prove its defenses.  Further, the parties do not dispute that Coene was aware that Root existed.  According to Coene, however, although he had observed references to Root in Kodak documents and included her in his expert disclosures, he did not appreciate that she actually possessed relevant information upon which 3M would be relying.  Accordingly, the real dispute is whether 3M's

---

[9] In his motion, Coene only seeks monetary sanctions and does not seek preclusion of the Root Affidavit. (Docket # 63).  The question of the admissibility of the Root Affidavit is currently before the district court in connection with the pending summary judgment motions.  (Docket # 94).  Accordingly, this Court's decision does not address preclusion of the Root Affidavit.

references to and ultimate production of the Root Affidavit were sufficient to "otherwise" make

Coene aware that Root would be relied upon by 3M, in accordance with Rule 26(e), and, if so,

whether Coene was made aware that Root was a potential 3M witness in a timely manner.

Having reviewed the record, I conclude that 3M made Coene aware that it may

rely upon Root as a witness in satisfaction of its obligations to supplement its disclosures under

Rule 26(e), but that such disclosure was not made in a timely manner.  On August 27, 2013, 3M

provided Coene a copy of the Root Affidavit, which plainly informed Coene that Root was a

potential witness and of the general subject matter of her testimony, thus fulfilling the underlying

purpose of the initial disclosure provisions of Rule 26(a).  Although it is not entirely clear from

3M's counsel's affidavit, 3M apparently learned in February 2013 that Root would be the affiant

who would attest to the absence of crystalline silica in its native form at Kodak during the

relevant time period.  (Docket # 94-2).  Thus, 3M's duty to supplement its initial disclosures

arose in February 2013.  Yet, 3M waited until June 19, 2013 to reference the Root Affidavit and

did not provide the affidavit to Coene until August 27, 2013, a delay of approximately six

months.  3M has not offered any justification for this delay, and I find that its failure was not

substantially justified.

Although not substantially justified, the failure was nonetheless harmless.  At the

time of the disclosure in late-August 2013, fact discovery was proceeding and did not close until

October 15, 2013.  Six weeks was sufficient time to permit Coene to take Root's deposition or to

seek an extension of the discovery deadlines.  Further, as discussed in detail above, the record

reveals that the Root Affidavit confirmed information that was already known to Coene.  *See*

*Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, 2002 WL 31108380, *2 (S.D.N.Y. 2002)

("a failure to disclose witness information is 'harmless' if the other party was well aware of the

identity of the undisclosed witness and the scope of their knowledge well before trial"). Thus, I reject Coene's argument that the pending motions and the resulting adjournment of the Marshick and Spencer depositions resulted from the untimely disclosure of the Root Affidavit. Having concluded that 3M's technical violation of its Rule 26 obligations was ultimately harmless, I determine that Coene is not entitled to monetary sanctions.

### E.     Coene's Motion to Extend the Dispositive Motion Deadline

On October 1, 2013, 3M filed a motion for summary judgment, and on October 14, 2013, Coene filed a motion for partial summary judgment. (Docket ## 68, 71). On November 13, 2013, Coene filed a motion seeking an extension of the November 15, 2013 deadline to file dispositive motions. (Docket # 103). According to Coene, an extension is necessary because he has not completed discovery. (*Id.* at 1-2). Coene contends that all discovery was suspended on September 30, 2013, as a result of 3M's motion to strike the Second Meggs Report, which sought, in relevant part, to adjourn the previously-scheduled depositions of Marshick and Spencer. (*Id.*). According to Coene, those two depositions have not occurred. (*Id.*). In addition, Coene contends that he requested dates to depose two of 3M's experts, Kevin Grady ("Grady") and Charles White ("White"), but 3M failed to offer any dates for those experts. (*Id.*). Finally, Coene contends that he would like to depose Root, but was unable to do so because discovery was suspended in September 2013. (*Id.*).

3M opposes the motion contending that discovery was never suspended. (Docket # 117). Instead, 3M contends that it sought a protective order adjourning only the depositions of Marshick and Spencer because their expected testimony could be affected by the Court's resolution of the pending motion to strike the Second Meggs Report. (*Id.* at 2). According to 3M, it never requested a stay of any other depositions or discovery. (*Id.* at 2-3).

With respect to the depositions of Grady and White, 3M contends that Coene never contacted it to schedule those depositions after it moved to strike the Second Meggs Report and never moved to compel those depositions.  (*Id.* at 3).  Similarly, with respect to Root, 3M maintains that nothing prevented Coene from scheduling her deposition.  (*Id.*).  In fact, according to 3M, Coene contacted Kodak in December 2013 to arrange the deposition of Root, thus belying his contention that he believed discovery was suspended.  (Docket # 117-1 at ¶ 8(b)).  3M does agree that the depositions of Marshick and Spencer will proceed after this Court's ruling on the pending motion to strike and that Coene should be permitted to file a motion seeking to preclude their testimony.  (Docket # 117 at 4).  However, according to 3M, Coene has not explained why the adjournment of those two depositions justifies an extension of the dispositive motion deadline.  (*Id.*).

Consistent with his disregard for the Local Rules, Coene filed an unauthorized reply in further support of his motion.[10]  (Docket # 118).  In that filing, Coene contends that 3M agreed to provide him with dates to depose their experts, but failed to do so.  (*Id.* at 1-2).  According to Coene, he should be permitted to take a video deposition of Marshick in order to present his testimony at trial.  (*Id.*).  Further, Coene contends that he should be permitted to depose 3M's experts, including Spencer, Grady and White, as well as Kodak's industrial hygienist, Root.  (*Id.* at 3).  Coene disputes that he has been dilatory in pursuing discovery.  (*Id.* at 4).  According to counsel for Coene, the forty-five day discovery period remaining after the late disclosure of the Root Affidavit was insufficient time to permit him to take all of the desired depositions.  (*Id.*).

---

[10] Coene's reply also seeks monetary sanctions for 3M's conduct.  (Docket # 118 at 4-5).  This relief is improperly sought for the first time in his reply.  *See, e.g.*, *Howard v. Cannon Indus., Inc.*, 2012 WL 5373458, *4 n.4 (W.D.N.Y. 2012) (citing *In re Dobbs*, 227 F. App'x 63, 64 (2d Cir. 2007) ("[w]e think that it was entirely proper for the District Court to decline to consider . . . argument[s] raised for the first time in [a] reply brief")). Accordingly, this Court will not entertain Coene's request for sanctions.

Rule 16(b) directs the court to enter a scheduling order that limits the time to amend the pleadings.  Fed. R. Civ. P. 16(b)(1).  A "scheduling Order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded . . . without peril."  *General v. Ctr. for Disability Rights*, 2010 WL 3732198, *2 (W.D.N.Y. 2010) (internal quotation omitted).  Thus, the rule provides that "[a] schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4); *Arnold v. Krause, Inc.*, 232 F.R.D. 58, 65 (W.D.N.Y. 2004) (no good cause to modify scheduling order to extend discovery when counsel made no attempts to conduct discovery until after deadline had passed), *aff'd and adopted*, 233 F.R.D. 126 (W.D.N.Y. 2005).  "Whether good cause exists turns on the diligence of the moving party."  *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation omitted); *Kodak Graphic Commc'ns Canada Co. v. E.I. Du Pont de Nemours & Co.*, 2011 WL 6826650, *3 (W.D.N.Y. 2011) ("a district court is obliged to consider the diligence of the moving party, as the 'primary' consideration, and it *may* consider other factors such as the prejudice to the non-moving party, where the consideration of such other factors is necessary to a reasonable exercise of discretion") (citing *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007)).

The only justification proffered by Coene for extension of the dispositive motion deadline is his assertion that he was unable to complete discovery during the period set forth in this Court's scheduling order because fact discovery was suspended, 3M failed to provide dates for the deposition of its experts and the late disclosure of the Root Affidavit prevented Coene from taking her deposition prior to the close of fact discovery.  (Docket ## 103, 118).  Fact discovery in this matter closed on October 15, 2013.  (Docket # 58).  It is important to note that there is no pending motion requesting either an extension of the discovery deadline or the

reopening of the discovery period.  Coene's only written request to extend the fact discovery deadlines is buried on the last page of his first unauthorized sur-reply to 3M's motion to strike the Second Meggs Report filed on September 30, 2013.  (Docket # 67 at 5).  Coene's counsel orally reiterated this request during argument on that motion on November 13, 2013.  (Docket # 102 at 48-50).  Neither of these requests properly presents the issue to the Court for resolution.

Even if Coene had properly sought an extension of or reopening of the discovery period, he has failed to demonstrate good cause for his failure to complete discovery within the period set forth in the scheduling order.  A request to reopen discovery "should be denied where the moving party 'has not persuaded th[e] Court that it was impossible to complete the discovery by the established deadline.'"  *Gotlin v. Lederman*, 2007 WL 1429431, *2 (E.D.N.Y.), *report and recommendation adopted*, 2007 WL 2088875 (E.D.N.Y. 2007) (quoting *Gavenda v. Orleans Cnty.*, 1996 WL 377091, *1 (W.D.N.Y. 1996)).  Further, the Second Circuit has held that the discovery period should not be extended when a party has had ample opportunity to pursue the evidence during discovery.  *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989) ("trial court may properly deny further discovery if the nonmoving party has had a fully adequate opportunity for discovery"); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 927 (2d Cir. 1985) (denying further discovery because plaintiff had "ample time in which to pursue the discovery that it now claims is essential"); *see also Kulkarni v. City Univ. of New York*, 2003 WL 23319, *3 (S.D.N.Y. 2003) (denying request to reopen discovery because of prejudice that would result to defendant) (citing *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d at 511; *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d at 927).

As an initial matter, I find wholly disingenuous Coene's assertions that he believed that all discovery was suspended.  As mentioned above, during argument on the motion to strike the Second Meggs Report, counsel for Coene orally requested an extension of the discovery deadline, but never indicated that he believed that discovery was suspended.  Indeed, the Court questioned Coene's counsel in depth as to his efforts to secure the deposition of Root. (Docket # 102 at 45-48).  Coene's counsel ultimately conceded that he had made no efforts to secure Root's deposition, but never represented that he thought discovery had been suspended. (*Id.*).  Thus, the record establishes that the only discovery that was suspended as a result of the pending motion to strike were the scheduled depositions of Marshick and Spencer.

Coene also contends that he sought to depose 3M's other experts, including Grady and White, but that 3M failed to provide available dates for those depositions.  Assuming that Coene's counsel's statement that he "need[ed] to take your guys as well" sufficiently requested dates for Grady and White, 3M's failure to provide dates does not excuse Coene's failure to complete the depositions prior to the deadline.  If 3M did not provide dates as requested, it was incumbent upon Coene, the party seeking the discovery, to notice those depositions or to seek appropriate relief from this Court.

Finally, Coene contends that he was unable to depose Root before the deadline expired because she was not properly disclosed until August 27, 2013, approximately forty-five days prior to the deadline.  Coene's counsel contends that his schedule was too busy to permit him to depose her within that time frame.  Despite Coene's assertions that Root was an important witness with "valuable information," he conceded that during that entire forty-five day period he did not undertake any efforts to secure her deposition.  (Docket # 102 at 45-49).  The failure to attempt even to schedule her deposition, or to secure from this Court an extension of the

deadline, belies the diligence necessary to justify the request to reopen or extend the discovery deadline.

Accordingly, the only discovery to be completed are the depositions of Marshick and Spencer, which were adjourned by this Court in September 2013, and the discovery authorized by the Court in connection with the Second Meggs Report.  The parties are also directed to confer and jointly propose an agreed-upon deadline for the completion of Marshick's and Spencer's depositions to this Court within **fourteen (14) days from the entry of this Decision and Order**.

Both parties have filed summary judgment motions that are currently pending before the district court.  Accordingly, the Court declines to extend the dispositive motion deadline.  The parties may apply directly to the district court for permission to supplement their pending summary judgment motions or to file additional dispositive motions.  Any such requests must articulate the basis upon which the party seeks to supplement their pending motion or file additional dispositive motions.

## II.   <u>Coene's Motion to Strike Whysner Report</u>

### A.   <u>Factual Background</u>

3M retained Whysner, an Associate Clinical Professor of Environmental Health Services at Columbia University, as an expert to rebut Meggs's exposure opinion.  (Docket # 100-5 at 1).  Coene argues that Whysner's report should be excluded because Whysner is not qualified to provide an opinion on Coene's medical diagnosis.  (Docket # 77-1 at 2).  In addition, Coene argues that Whysner's testimony lacks foundation.  (*Id.* at 3-6).  According to Coene, Whysner's analysis ignores the fact that the fiberglass to which Coene was exposed was heated.

Coene contends that the literature considered by Whysner only addressed exposure to fiberglass that was not exposed to heat. (*Id.*). Further, Coene argues that Whysner's inability to define the term "devitrification" establishes that Whysner did not properly consider the impact of heat and the laser sintering process on the fiberglass material that Coene used. (*Id.*). According to Coene, the only article discussed by Whysner that involved the process of laser sintering was an unpublished article that had not been subject to peer review. (*Id.*). Accordingly, Coene contends that Whysner's exposure opinion fails to fit the facts of this case. (*Id.*).

In response, 3M contends that Whysner is a highly qualified toxicologist who teaches classes on environmental health matters, including silicosis. (Docket # 100 at 3-4). According to 3M, it retained Whysner to employ his experience as a toxicologist and a biochemist to assess the validity of Meggs's methodology and to opine as to whether Meggs has established, through the use of reliable methodology, that the operation of the laser sintering device using Duraform GF, the native material used by Coene, is capable of causing silicosis. (*Id.*). 3M maintains that Whysner does not attempt to diagnose Coene's condition. (*Id.* at 4-5). During oral argument, 3M's counsel clarified that although 3M did not intend to offer Whysner for the purpose of providing a medical diagnosis, he should not be precluded from testifying about medical issues as they overlap with his toxicological assessment. Further, 3M maintains that it should be permitted to elicit Whysner's testimony that he concurs with Dr. Grady's assessment that Coene suffers from sarcoidosis and not silicosis.

3M counters that Whysner's opinion rests upon a valid foundation. (*Id.* at 6-10). According to 3M, Whysner applied the Bradford Hill[11] analysis to Meggs's exposure theory and

---

[11] "Bradford Hill" criteria refers to a set of factors that epidemiologists generally consider when determining "whether a statistical association is indeed causal." *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 168 (E.D.N.Y. 2001), *aff'd* 303 F.3d 256 (2d Cir. 2002). The set of criteria are named after Sir

opined that Meggs's theory was unsupported in the scientific literature and that Meggs failed to establish that laser sintering is capable of causing silicosis. (*Id.* at 6-7). Further, 3M maintains that Whysner considered whether exposure to the Duraform GF product in its native form could cause silicosis and also whether the end product of the material that was created during the laser sintering process could cause silicosis. (*Id.* at 7). 3M further maintains that Whysner testified at his deposition concerning the effect of temperature on Duraform GF and that he also reviewed scientific literature in order to determine the temperatures generated during the laser sintering process. (*Id.* at 8). In addition, 3M maintains that Whysner's inability to define the term "devitrification" is irrelevant. (*Id.* at 9). According to 3M, the term is not used in Meggs's report, nor did Meggs use the term in his deposition. (*Id.*). In any event, Whysner's deposition testimony establishes that Whysner understood and considered the process of "devitrification," even if he was unable to provide a definition for the term. (*Id.*).

---

Austin Bradford Hill, a professor of medical statistics, who first identified the factors. *See Rains v. PPG Indus., Inc.*, 361 F. Supp. 2d 829, 835 & n.4 (S.D. Ill. 2004). The criteria include:

(1) Strength: How strong is the association between the suspected risk factor and the observed outcome?;

(2) Consistency: Does the association hold in different settings and among different groups?;

(3) Specificity: How closely are the specific exposure factor and the specific health outcome associated? I.e., how unique is the quality or quantity of the response?

(4) Temporality: Does the hypothesized cause precede the effect?;

(5) Biological plausibility: Does the apparent association make sense biologically?;

(6) Coherence: Is the association consistent with what is known of the natural history and biology of the disease?;

(7) Experimental verification: Does any experimental evidence support the hypothesis of an association?;

(8) Biological analogy: Are there examples of similar risk factors and similar outcomes?; and

(9) Dose-response relationship: Has a dose-response relationship been established, i.e., does the magnitude of the response increase as the magnitude of the dose increases?

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d at 168.

In reply, Coene maintains that Whysner opined in his deposition that Duraform GF has two separate melting points, one for the polymer resin components and one for the glass component. (Docket # 107 at 3). According to Coene, the methodology that Whysner applied to reach his conclusion is not reliable.[12] (*Id.*). First, Coene contends that Whysner's temperature opinion is based upon an unpublished research article written by an undergraduate student. (*Id.*). Second, Coene contends that Whysner's opinion also relied upon brochures for Duraform GF and Duraform PA, both of which were obtained from the internet. (*Id.* at 4). According to Coene, Whysner is unable to establish that the Duraform GF referenced in the brochure is the same material that Coene used at Kodak. (*Id.*). Coene maintains that Whysner's reliance on the unpublished article and his unfounded assumptions that the materials are the same render his opinion unreliable and warrant exclusion. (*Id.* at 5-6). Finally, Coene maintains that the Bradford Hill criteria are inapplicable to this case because the criteria are used to evaluate whether exposure to a given substance can cause a particular disease. (*Id.* at 7-8). According to Coene, there is no dispute that exposure to silica causes silicosis. (*Id.*).

### B.    Whysner's Report and Testimony

Whysner received an undergraduate degree in biology from Johns Hopkins University in 1964 and completed a combined MD/PhD program in biochemistry at the University of Southern California School of Medicine in 1970. (Docket # 100-4 at 1). Whysner completed his residency in pediatrics in 1971 and was employed as a research associate at the National Institute of Child Health and Human Development from 1971 through 1973. In 1972, Whysner became licensed to practice medicine in the District of Columbia, and he became

---

[12] Coene also argues in his reply papers that Whysner's opinion was not timely disclosed and that the opinion improperly relies upon the Root Affidavit. (Docket # 107 at 1-2, 9-10). These arguments are improperly raised for the first time in his reply. *See, e.g.*, *Howard v. Cannon Indus., Inc.*, 2012 WL 5373458 at *4 n.4 (citing *In re Dobbs*, 227 F. App'x at 64 ("[w]e think that it was entirely proper for the [d]istrict [c]ourt to decline to consider . . . argument[s] raised for the first time in [a] reply brief")).

licensed to practice in Pennsylvania in 1973.[13]   (*Id.* at 2).  He served as the Director of

Biomedical Research for the Special Action Office for Drug Abuse Prevention in the Executive

Office of the President from 1973 through 1974, at which time he became President of Medical

Research Applications, Inc., a position he held until 1982.  (*Id.* at 1).  In 1982, Whysner became

Vice President of Washington Occupational Health Associates, Inc., a position he continues to

hold today.  (*Id.*).  In addition, between 1989 and 2002, Whysner served as the head of the

Toxicology and Risk Assessment Program and the Chief of the Division of Pathology and

Toxicology at the American Health Foundation.  (*Id.*).  Since 2004, Whysner has also been

employed as an Associate Clinical Professor of Environmental Health Sciences at Columbia

University.  (*Id.*).  In addition, Whysner has authored or contributed to numerous publications on

a variety of topics, including human exposures to toxic substances.  (*Id.* at 5-10).

      According to his report, Whysner was retained to determine whether Coene's lung

disease could have been caused by his alleged exposures during his employment at Kodak

between 1992 and 2003.  (Docket # 100-5).  To do this, Whysner reviewed relevant materials,

including Meggs's report, to determine whether it had been established that the operation of the

laser sintering device using Duraform GF was capable of causing silicosis or that any exposure

during the laser sintering process using the Duraform GF could have caused Coene's lung

disease.  (*Id.* at 1).

      First, Whysner researched the medical and scientific literature to determine

whether exposure to fiberglass in humans has been causally associated with silicosis.  (*Id.* at 5).

According to Whysner, he found no literature suggesting that exposure to either fiberglass or the

glass formed by the laser sintering process is capable of causing silicosis.  (*Id.*).  Next, Whysner

reviewed the Material Safety Data Sheet ("MSDS") for Duraform GF and determined that the

---

[13] Whysner's resume suggests that he is no longer licensed to practice medicine in either location.  (*Id.*).

type of silicon dioxide that is contained in Duraform GF is a fibrous glass.  (*Id.* at 7).  According to Whysner, nothing in the MSDS suggested that crystalline silica was present in or could be formed by using the Duraform GF.  (*Id.*).  Whysner also reviewed documents produced by agencies that study the effects of silicon dioxide exposure.  (*Id.* at 8).  According to Whysner, these agencies evaluate amorphous forms of silica differently from crystalline forms of silica. (*Id.*).  Further, Whysner opined that none of the agencies concluded that exposure to fiberglass caused silicosis or other lung disease.  (*Id.*).

Whysner also applied the Bradford Hill analysis, which is a generally accepted scientific methodology for assessing causation, according to Whysner.  (*Id.* at 11).  He first reviewed medical and scientific literature and concluded that available studies do not show a causal relationship between silicosis and exposure to fiberglass.  (*Id.* at 14).  Whysner also examined clinical studies of workers exposed to fiberglass.  (*Id.* at 14-15).  According to Whysner, none of the studies established that exposure to fiberglass caused respiratory problems in humans.  (*Id.* at 15).  Next, Whysner reviewed Coene's medical records and the report provided by Dr. Grady, the medical expert hired by 3M to conduct an independent evaluation. (*Id.* at 15-16).  According to Whysner, Grady opined that Coene's diagnosis was sarcoidosis and not silicosis.  (*Id.* at 16).  Whysner concurred with Grady's opinion and further noted that the "lack of progression of the disease argues against silicosis and for sarcoidosis."  (*Id.*).

Whysner then reviewed Meggs's report and opined that Meggs had not provided any information to support his conclusion that Coene was exposed to respirable silica.  (*Id.* at 16-17).  Instead, according to Whysner, Meggs appeared to have *assumed* that sintering fiberglass with a laser would produce respirable silica because the literature cited by Meggs did not support his conclusions.  (*Id.*).

Whysner concluded that (1) Meggs failed to establish that the fiberglass contained in Duraform GF was capable of causing silicosis and (2) there was no basis to conclude that the laser sintering process is capable of producing respirable silica that could have caused or contributed to Coene's lung disease.  (*Id.* at 17).  According to Whysner, no other source of silica was documented in Coene's workplace.  (*Id.*).  Thus, Whysner concluded that Coene's likely suffers from sarcoidosis and not silicosis.  (*Id.* at 17-18).

During his deposition, Whysner testified that he generally employs the same methodology in performing a causation analysis.  (Docket # 100-7 at 11).  First, he attempts to determine the types of substances to which an individual has been exposed.  (*Id.*).  He then determines whether exposure to the substance has been associated with any particular disease.  (*Id.* at 11-12).  Finally, he attempts to determine the dose and response of the exposure to determine whether the dose to which the particular individual was exposed was sufficient to produce the disease.  (*Id.*).

With respect to this case, Whysner testified that he first attempted to determine whether Coene was exposed to respirable silica by considering the native material that Coene worked with and also considered whether there was evidence that the laser sintering process could produce respirable silica.  (*Id.* at 12).  According to Whysner, he reviewed Meggs's report and the literature cited therein and conducted his own research, but determined that nothing supports the conclusion that the laser sintering process produced respirable silica.  (*Id.* at 13).  Whysner also canvassed scientific and medical literature in order to determine whether there were any reports suggesting that individuals who performed laser sintering developed silicosis.  (*Id.* at 14-15; Docket # 107-1 at 3).  According to Whysner, there were no case reports, clinical studies or epidemiological studies suggesting a causal relationship between laser sintering and

silicosis.  (Docket # 100-7 at 15-16).  Thus, according to Whysner, he was ultimately unable to perform a full Bradford Hill assessment.  (*Id.* at 16).

In conducting his assessment, Whysner testified that he considered the temperature applied to the Duraform GF material by Coene.  (Docket # 106 at 2).  According to Whysner, he is generally aware from his experience that fiberglass melts at approximately 2,000 degrees centigrade and that he "looked up" the precise melting point for fiberglass in conducting his analysis.  (*Id.* at 2, 6; Docket # 107-1 at 2).  According to Whysner, the authorities relied upon by Meggs indicated that amorphous silica can crystallize at temperatures of approximately 600 to 700 degrees centigrade.  (Docket # 100-6 at 2, 7).  Whysner then attempted to determine the temperatures created during the laser sintering process.  (*Id.* at 3).  According to Whysner, the MSDS for Duraform GF provided a melting point temperature of 170 degrees centigrade.  (*Id.* at 4).  It further provided that the material consisted of both fiberglass and a polyamide resin.  (*Id.*).  Accordingly, although he did not know the precise temperature that was reached during the laser sintering process, Whysner concluded that the polyamide component of the Duraform was sufficiently heated to transform into a nylon material.  (*Id.* at 4-5; Docket # 100-7 at 3).  Thus, Whysner determined that the substance in Duraform GF that melted was the polymer resin, not the fiberglass – meaning that the amorphous silica was not transformed, which would have been necessary to create respirable silica.  (Docket # 100-7 at 7-8).

According to Whysner, Meggs's report did not discuss specific temperatures, although Meggs did testify about temperatures during his deposition.  (Docket # 100-6 at 8-9).  Whysner testified that during his deposition Meggs testified that Coene had told Meggs that the temperature of the laser sintering process was approximately 170 degrees centigrade.  (*Id.*).  After reading Meggs's testimony, Whysner conducted additional research to attempt to

determine the temperatures that were created during the laser sintering process.  (*Id.* at 8-9, 11-12).

During his additional research, Whysner discovered an article written by a University of Wisconsin student who conducted testing to determine the temperatures reached during the laser sintering of Duraform PA.  (*Id.*; Docket # 100-7 at 2).  Whysner stated that he understood Duraform PA to be the same material as Duraform GF without the fiberglass component.  (Docket # 100-7 at 2, 6-7).  According to the study, the Duraform PA material transformed at approximately 140 to 170 degrees centigrade during the laser sintering process. (*Id.* at 7).

Because the author of the study used Duraform PA and not Duraform GF in conducting her testing, Whysner attempted to determine whether the two materials had similar melting points.  (Docket # 100-6 at 11).  Whysner conducted internet research and found two brochures, one for Duraform PA and one for Duraform GF.  (Docket # 107-1 at 2).  According to those brochures, both materials had similar melting points of approximately 184 to 185 degrees centigrade.  (*Id.* at 2, 5; Docket # 100-6 at 11).  Whysner testified that he assumed that these materials were the same materials used at Kodak because the term Duraform is trademarked. (Docket # 107-1 at 3).

During his deposition, Whysner testified that he did not know the precise definition for the term "devitrification," but stated that he did review some articles that referred to the term.  (Docket # 100-6 at 6, 14).  Although he could not define the term, Whysner did not agree that he lacked knowledge about the process of devitrification.  (*Id.* at 13).  Whysner also testified that although he was familiar with silicosis and his report contained background

information about aspects of the disease, he would not be offering testimony concerning the

diagnostic protocol for silicosis.  (Docket # 100-7 at 9-10).

### C.   Discussion

Rule 702 of the Federal Rules of Evidence requires that a proposed expert witness

be qualified on the basis of "scientific, technical, or other specialized knowledge [that] will help

the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.

Accordingly, an expert may provide testimony if (1) "the testimony is based upon sufficient facts

or data"; (2) "the testimony is the product of reliable principles and methods"; and, (3) "the

expert has reliably applied the principles and methods to the facts of the case."  *Id.*  The trial

court must fulfill a "gatekeeping" duty under Rule 702 to ensure that any expert testimony to be

admitted is "not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  Thus, the

trial court's inquiries should focus on three issues:  "(1) whether the witness is qualified to be an

expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the

expert's testimony on a particular issue will assist the trier of fact."  *Arista Records LLC v. Lime*

*Grp. LLC*, 2011 WL 1674796, *1 (S.D.N.Y. 2011) (citing *Nimely v. City of New York*, 414 F.3d

381, 396-97 (2d Cir. 2005)).

Under *Daubert* and *Kumho Tire*, a court must "first determine whether the

proffered testimony is relevant."  *Am. Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*,

2008 WL 1995120, *3 (W.D.N.Y. 2008)*.  Further, the testimony must "help the trier of fact to

understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *see also Daubert v.*

*Merrell Dow Pharm., Inc.*, 509 U.S. at 591; *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d

179, 184 (2d Cir. 2001).  The question is one of "fit," meaning that the evidence must be

"sufficiently tied to the facts of the case." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).  After determining that the proffered testimony is relevant, the court must determine whether the proffered testimony "has a sufficiently 'reliable foundation' to permit it to be considered." *Am. Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*, 2008 WL 1995120 at *3 (quoting *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d at 184-85).  The court has "considerable leeway" in deciding how best to make that determination.  *Kumho Tire Co. v. Carmichael*, 526 U.S. at 152.

In determining reliability, the trial court must "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the [court's] belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d at 267.  To assist courts in making this determination, the Supreme Court has identified the following factors to consider when determining the reliability of the methodology used by a proffered expert:  "(1) whether the theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique has been met with widespread acceptance." *Emig v. Electrolux Home Prods. Inc.*, 2008 WL 4200988, *6 (S.D.N.Y. 2008) (citing *Daubert*, 509 U.S. at 593-94).  The Rule 702 inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, and while "a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned[,] . . . [the] list of specific factors neither necessarily nor exclusively applies to all experts or in every case," *Kumho Tire Co.*, 526 U.S. at 141.  "The primary objective is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practices of an expert in the relevant field.'" *Cerbelli v.*

*City of New York*, 2006 WL 2792755, *2 (E.D.N.Y. 2006) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

Toxicology is the "science of poisons." *Mancuso v. Consol. Edison Co. of New York, Inc.*, 967 F. Supp. 1437, 1445 (S.D.N.Y. 1997). Thus, "[t]he discipline of toxicology is primarily concerned with identifying and understanding the adverse effects of external chemical and physical agents on biological systems." Federal Judicial Center, Reference Manual on Scientific Evidence 635 (3d ed. 2011). In toxic tort cases, toxicologists are routinely called upon to provide information to assist the fact finder in evaluating "the causal probability that an adverse event with potentially many causes is caused by a specific agent." *Id.* Typically, the basis of a toxicologist's expert opinion will be "a thorough review of the research literature and treatises concerning effects of exposure to the chemical at issue," as well as the expert's application of "fundamental concepts of toxicology relevant to understanding the actions of chemicals in biological systems." *Id.* at 675. Although a toxicologist may be qualified to testify as to causation, a toxicologist is generally not qualified to offer a medical diagnosis. *See Plourde v. Gladstone*, 69 F. App'x 485, 487 (2d Cir. 2003) (affirming preclusion of toxicologist's testimony because toxicologist was not qualified to provide a medical diagnosis); *Kristensen ex rel. Kristensen v. Spotnitz*, 2011 WL 4380893, *12 (W.D. Va. 2011) (toxicologist is qualified to give medical causation testimony concerning the effects of mold on human health); *Fanning v. Sitton Motor Lines, Inc.*, 2010 WL 4261476, *3 (D. Kan. 2010) (precluding toxicologist's medical diagnosis opinion; "as [the toxicologist] concedes, he is not a medical practitioner and thus has never diagnosed a patient[;] . . . [a]s a result, he is not qualified to provide a clinical diagnosis"); *Ford v. Carnival Corp.*, 2010 WL 9116184, *2 (S.D. Fla. 2010) (toxicologist was not qualified to diagnose plaintiff's injuries, but could provide testimony relevant to medical

causation); *Cleveland v. United States*, 2006 WL 5334601, *4 (N.D. Ga. 2006) ("toxicologists

are qualified to offer opinions regarding causation in toxic tort cases[;] . . . cause-and-effect

determinations in toxic tort cases fall squarely within the province of toxicologists") (citing

Federal Judicial Center's Reference Manual on Toxicology); *Mateer v. U.S. Aluminum*, 1989

WL 60442, *7 n.7 (E.D. Pa. 1989) ("[the expert] is a research biochemist, not a medical doctor,

and is thus unqualified under Fed. R. Evid. 702 to render medical diagnoses . . . [but] is not

disqualified, because of his lack of medical training, from testifying on the effects of exposure to

toxic substances, when such testimony is augmented by testimony from a qualified physician");

*Owens v. Concrete Pipe & Prods. Co.*, 125 F.R.D. 113, 115 (E.D. Pa. 1989) ("[the experts] may

not be qualified to diagnose [plaintiff's] medical condition, but this does not disqualify them

from giving testimony concerning topics such as the risks associated with varying degrees of

exposure to certain chemicals").

   Coene challenges Whysner's testimony, in part, on the grounds that Whysner is a

toxicologist and does not routinely treat or diagnosis patients.  Thus, Coene maintains Whysner

is not qualified to offer an opinion as to Coene's medical diagnosis.  Having reviewed Whysner's

resume, report and the submitted deposition testimony, I agree with Coene that Whysner is not

qualified to provide an opinion on Coene's diagnosis; as a board certified toxicologist and a

formerly licensed physician, however, Whysner is qualified to discuss medical concepts to the

extent they overlap or provide background information relating to his toxicological opinion.  3M

contends that Whysner should be permitted to testify that he concurs with Grady's opinion that

Coene suffers from sarcoidosis instead of silicosis.  I disagree.  During his deposition, Whysner

testified that he had not practiced medicine during the past twenty-three years and that he had

never treated silicosis or sarcoidosis.  (Docket # 77-2 at 2-3).  In addition, Whysner conceded

that he was not an expert on the various forms of silicosis and that he would not be testifying as to how silicosis is diagnosed.  (*Id.* at 4; Docket # 100-7 at 9-10).  Whysner's own testimony suggests that he is not qualified to opine on Coene's diagnosis, and the proposed testimony of Whysner's concurrence with Grady's conclusions is an improper attempt to bolster Grady's opinion.

I reject Coene's remaining challenges to Whysner's testimony.  First, Whysner's report and the submitted deposition testimony make clear that Whysner considered the impact of the temperature generated during the laser sintering process in rendering his opinion, undermining Coene's argument that Whysner's opinion does not "fit" the facts of this case.  Coene's remaining contentions, including that Whysner did not know the definition of the term "devitrification" and that he relied upon an unpublished article and product brochures obtained from the internet, are proper subjects for cross-examination and go to the weight of Whysner's testimony, as opposed to its admissibility and thus, do not warrant preclusion.  *See United States v. Bays*, 2014 WL 3764876, *9 (N.D. Tex. 2014) ("the [c]ourt agrees with the [g]overnment that [d]efendant's concerns regarding [the expert's] use of unpublished scientific studies go to the weight of the evidence rather than the admissibility of his opinions"); *Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1674796 at *7 ("[a]rguments about the assumptions and data underlying an expert's testimony go to the weight, rather than the admissibility, of that testimony").

## CONCLUSION

For the reasons discussed above, 3M's motions to strike the Second Meggs Report and Coene's sur-replies (**Docket ## 62, 84**) are **DENIED**, although Coene shall be

required to bear any expert fees and costs associated with discovery relating to the Second

Meggs Report.  Further, Coene's motions for sanctions and to extend the dispositive motion

deadline **(Docket ## 63, 103)** are **DENIED**.  Finally, Coene's motion to preclude Whysner as an

expert **(Docket # 77)** is **GRANTED in PART and DENIED in PART**.

**IT IS SO ORDERED.**


                                                        *s/Marian W. Payson*
                                    _____
                                                MARIAN W. PAYSON
                                            United States Magistrate Judge


Dated: Rochester, New York
        September 11, 2014