UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ROBERT COENE and VALERIE
COENE,

                             **Plaintiffs,**

                    v.                          10-CV-6546FPG-MWP

3M COMPANY, AS SUCCESSOR BY
MERGER TO MINNESOTA MINING &
MANUFACTURING COMPANY AND/OR
ITS PREDECESSORS/SUCCESSORS IN
INTEREST, DTM CORPORATION,
VALIMET, INC., POTTERS INDUSTRIES,
INC., AND ARKEMA, INC.

                             **Defendants.**

---

## DEFENDANT 3M COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF <u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>

### INTRODUCTION

      After additional discovery, including the depositions of Drs. William Meggs and Jeffrey Marshick, Defendant 3M Company ("3M") renews its Motion for Summary Judgment (ECF Doc. 68), originally filed in October 2013. 3M submits this Memorandum to explain that Plaintiffs have failed, even after this additional discovery, to create a triable case.[1]

      The essential reason to grant summary judgment has not changed: this is a personal injury case resulting from Mr. Coene's alleged exposure to respirable crystalline silica, but without evidence of any respirable crystalline silica. Although Plaintiffs have expanded their case into

---

[1] Throughout this Memorandum, 3M will refer to facts in the exhibits to its October 2013 Motion and will cite additional discovery materials as needed.

1

alleged nylon and resin exposures, they cannot prove the existence of respirable nylon and resin either. Plaintiffs rely on expert witness testimony to do so, but the testimony is inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Plaintiffs' claims against 3M are based on Mr. Coene's use of a 3M 8710 respirator, which Plaintiffs say did not adequately protect Mr. Coene from exposure to silica. (ECF Doc. 1 at ¶¶ 18, 26.) The only worksite where Mr. Coene claims to have worn a 3M 8710 respirator is a laboratory at Eastman Kodak Company in Rochester, New York.

The Kodak laboratory where Coene worked did not have any native respirable crystalline silica. This is not disputed. For this reason, Plaintiffs have designated Dr. William Meggs to testify that selective laser sintering, or "SLS," an industrial process Mr. Coene performed in the Kodak lab somehow *created* respirable crystalline silica, along with respirable nylon and respirable resin. According to Dr. Meggs, Mr. Coene's exposure to the silica, nylon, and resin combined to cause him to develop interstitial lung disease. Dr. Meggs is the only witness who will offer this opinion.

But Dr. Meggs's testimony is inadmissible. Dr. Meggs has a medical degree, but that degree does not qualify him to opine that the SLS process changes the chemical composition of materials to make them toxic and respirable, and therefore capable of causing interstitial lung disease. That sort of analysis is not what medical doctors do, and it is not what Dr. Meggs does; he concedes that he has no background in the SLS process or related processes. Even if Dr. Meggs were qualified to offer the opinion, he has not developed a reliable factual basis for it, nor has he applied a scientific methodology to reach it. Instead, Dr. Meggs has conjured his opinion

out of thin air. He acknowledges that if the Court is to accept his theory, it must accept that this is the first case in history where SLS has caused this sort of injury.

The Court should not wander with Dr. Meggs into the pseudo-scientific frontier without reliable support. It should disregard Dr. Meggs's opinion and, upon doing so, it will be left with no causation evidence. Without Dr. Meggs's testimony, there is no evidence that Mr. Coene was exposed to toxic, respirable dust—much less respirable crystalline silica—at Kodak. Thus, there is no causation evidence. Without causation evidence, all other fact disputes become immaterial, and the Court must grant summary judgment.

## FACTS

**I.    Mr. Coene's work history.**

Mr. Coene worked in a laboratory at Kodak from 1992 to 2002. (ECF Doc. 68-1 at ¶ 5(i).) He was a technician for two different prototyping processes; one was the SLS process, which he believes exposed him to respirable crystalline silica. (*Id*. at ¶ 5(ii)-(iii).)

The SLS process uses lasers to bind together materials to create a desired shape. A cartridge containing various ingredient materials is placed in a large cylindrical machine, which then heats the cartridge and strikes it with a laser at certain points to form a figure. The shape and dimensions of the figure are based on a design that is transmitted to the machine by a computer. (*Id*. at ¶ 5(v).) During Mr. Coene's time at Kodak, the company used SLS to create prototype camera parts. (*Id*. at ¶ 5(vi).)

Mr. Coene's job was to insert cartridges into the machine, take prototypes out of the machine once the machine had done its work, and remove any excess powder from the prototypes with a brush and abrasive blaster.[2] He also cleaned up dust and powder from the

---

[2]    Plaintiffs do not contend that the abrasive material used in the blaster contained silica or caused silicosis. According to Plaintiffs' theory, if abrasive blasting had anything to do with

3

laboratory as needed. (*Id*.) While performing the SLS process from 1992-1998, Coene claims that he wore a 3M 8710 respirator. (*Id*. at ¶ 5(vii).) From 1998-2002, he wore some other respiratory protection product. (*Id*.) After leaving Kodak in 2002, Coene went to work for a different company in Auburn Hills, Michigan, which also used SLS. In Michigan, Coene again wore a non-3M respiratory protection product. (*Id*. at ¶ 5(vii).)

**II.     The absence of respirable crystalline silica at Kodak.**

Importantly, the powders used in the SLS process at Kodak did not contain respirable crystalline silica. (*Id*. at ¶ 6.) Katherine Root, a Senior Industrial Hygienist for Kodak, has confirmed that respirable crystalline silica was not used in the areas where Mr. Coene worked. (*Id*.; *see also* ECF Doc. 68-4.) Some of the powders—namely, "Duraform GF" and "DTM Laserite"—contained a combination of glass, nylon, and resin. The glass was not in a respirable state, and Dr. Meggs does not have any information showing the nylon and resin were in a respirable state. (Defendant 3M Company's Affidavit in Support of Renewed Motion for Summary Judgment ("Feb. 2016 Aff.") at ¶ 9(b).)

**III.    Mr. Coene's diagnosis and Plaintiffs' shifting theories.**

Notwithstanding the absence of respirable crystalline silica at Kodak, Mr. Coene's treating physician, Dr. Marshick, has diagnosed him with silicosis, a disease caused by the inhalation of respirable crystalline silica. (*See* U.S. Dep't of Labor, OSHA Fact Sheet (2002), *available at* https://www.osha.gov/OshDoc/data_General_Facts/crystalline-factsheet.pdf; Feb. 2016 Aff. at ¶ 10(a).) But in reaching this diagnosis, Dr. Marshick has not attempted to analyze Mr. Coene's occupational dust exposures at Kodak, or at any other place Mr. Coene has worked.

---

causing Mr. Coene injury, it was because he was blasting away powders that Plaintiffs allege contained toxic dust.

(Feb. 2016 at ¶ 10(b).)[3]

The person Plaintiffs hired to analyze those exposures is Dr. Meggs, who is a physician but not Mr. Coene's treating physician. Initially, Dr. Meggs agreed with Dr. Marshick's diagnosis and theorized that SLS somehow *created* respirable crystalline silica through a chemical reaction catalyzed by the heat of the SLS machine's laser. (ECF Doc. 68-7 at ¶¶ II, V.) The absence of native respirable crystalline silica at Kodak necessitated this theory of silica creation. But after Dr. Meggs was deposed for the first time in this case and cross-examined on his theory, he changed his mind and submitted a new expert report. In the new report, Dr. Meggs theorized that the SLS process *also* created respirable nylon and resin, which caused interstitial lung disease, not just silicosis. (ECF Doc. 62-1 at pp. 16-17.)

Dr. Meggs's unexpected, last-minute shift in theories set off a flurry of motions regarding whether the new theory would be allowed. (*See* ECF Docs. 62-64, 67.) Ultimately, the Court held that Dr. Meggs's new report was untimely and prejudicial, but that the prejudice could be cured by allowing 3M additional discovery, with Plaintiffs paying the resulting fees and costs. (ECF Doc 122 at pp. 17-23.) 3M therefore deposed Dr. Meggs a second time to learn about his new theory.

3M now submits this Renewed Motion for Summary Judgment because the new theory does not improve on the old one, and still fails to create a triable case.

## ARGUMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant makes this showing by establishing "that an adverse party cannot

---

[3] Dr. Marshick's testimony will be limited to Mr. Coene's condition and his treatment of Mr. Coene. Feb. 2016 Aff. at ¶ 10(c). He has no evaluated the SLS process. *Id*. at ¶ 10(b).

5

produce admissible evidence to support" an essential fact on which the adverse party will bear the burden of proof at trial. Fed. R. Civ. P. 56(c)(1)(B). Plaintiffs bear the burden to prove that Mr. Coene was exposed to a toxic, respirable dust at Kodak while wearing a 3M 8710 respirator. Plaintiffs also bear the burden now of showing that Dr. Meggs's testimony satisfies Federal Rule of Evidence 702 and the *Daubert* standard. *See United States v. Apple, Inc.*, 791 F.3d 290, 335 n. 24 (2d Cir. 2015).

I. **The summary judgment issue is whether Dr. Meggs can opine that the SLS at Kodak created toxic, respirable dusts capable of causing an interstitial lung disease.**

There is a dispute over Mr. Coene's diagnosis. His treating physician says silicosis; Plaintiffs' retained expert, Dr. Meggs, says interstitial lung disease; and other experts will say that Mr. Coene more likely has sarcoidosis, an autoimmune disease not caused by occupational exposures. (ECF Doc. 68-1 at ¶¶ 8-9.) For purposes of this Motion, that dispute is immaterial. The issue this Motion presents is *not* about Mr. Coene's medical diagnosis; instead, it is about whether the SLS process at Kodak *created* any toxic respirable dusts.

This issue is central to causation because there was no native respirable crystalline silica at the Kodak lab where Coene worked, and Dr. Meggs has conceded that he has no basis to conclude that the native nylon and resin in the powders used in SLS were of a respirable shape and size. (ECF Doc. 68-1 at ¶ 6; Feb. 2016 Aff. at ¶ 9(b).) Therefore, to prevail in this suit, Plaintiffs still must show that the native substances from the Kodak lab were somehow changed into toxic, respirable substances through a chemical reaction. They must prove the *creation* of toxic, respirable substances to show that Mr. Coene's work at Kodak could have caused silicosis, interstitial lung disease, or another occupational lung condition with which Mr. Coene has been diagnosed. Otherwise, 3M—the manufacturer of a respirator Mr. Coene claims to have used for some of his tenure at Kodak—cannot be liable.

6

**II.     Dr. Meggs is not qualified to testify on this issue.**

Dr. Meggs is a medical doctor, but medical training does not qualify him to opine that SLS catalyzes a chemical reaction that creates toxic, respirable substances. Under the Federal Rules of Evidence, an expert's testimony must be connected to his "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *see also* 29 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure* § 6265 (1997) ("[Q]ualification to testify . . . requires that the area of the witness's competence matches the subject matter of the witness's testimony."). "An expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007). Hence, a medical degree is not carte blanche to testify as an expert on every issue. *See Morritt v. Stryker Corp.*, 973 F. Supp. 2d 177, 187-189 (E.D.N.Y. 2013).

In *Morritt*, for example, an orthopedic surgeon sought to testify in a products liability case concerning a knee prosthesis. The surgeon wanted to testify not only that the prosthesis had experienced "polyethylene wear," but also that the cause of that wear was a product defect. *Id*. The court excluded the product defect aspect of his testimony, reasoning that the surgeon's opinion on the cause of wear went "well beyond the 'reasonable confines' of his clinical expertise." *Id*. at 188. Testifying about the "mechanical functioning" of a prosthesis would require expertise in "manufacturing processes, biomedical engineering, [and] material science," which are not areas of expertise a doctor possesses by virtue of his medical degree. *Id*.

Dr. Meggs, like the surgeon in *Morritt*, wants to stray beyond the reasonable confines of his expertise. Although his medical degree qualifies him as an expert in some areas, his qualifications do not connect with his testimony here, as he freely admits. Asked whether there

7

was "anything at all in your CV, in your publications, in your books, et cetera, that you intend to rely on specifically as it pertains to this case," Dr. Meggs answered, "No." (ECF Doc. 68-1 at ¶ 10(vi).) None of Dr. Meggs's teaching activities, publications, and presentations have anything to do with the SLS process, or with the chemical reactions the process might create. (*Id*. at ¶ 10(i).) In preparing for his depositions in this case, Dr. Meggs did not rely on any articles or data specifically pertaining to the SLS process. (*Id*. at ¶ 10(iv).)

Fundamentally, analyzing chemical reactions created by lasers is not what medical doctors do, and it is not what Dr. Meggs does. Just as the product defect/causation issue in *Morritt* called for expertise in "manufacturing processes, biomedical engineering, [and] material science," Plaintiffs' theory in this case calls for expertise in industrial processes, lasers, advanced chemistry, and industrial hygiene. 973 F. Supp. 2d at 188. These are not areas in which Dr. Meggs possesses expertise; his medical training and clinical experience are not related to the issue at hand. The Court must not allow Dr. Meggs to stray from his area of expertise by opining that SLS *creates* toxic, respirable dusts.

### III. The factual basis for Dr. Meggs's opinion is insufficient.

Dr. Meggs's failure to develop a reliable factual basis for his opinion makes his lack of expertise on the summary judgment issue even worse. An expert's opinion must be "based on sufficient facts or data." Fed. R. Evid. 702. "Where . . . expert testimony rests on inadequate factual foundations, problematic assumptions, or a misleadingly partial selection of relevant facts, it must be excluded under Rule 702." *Davis v. Carroll*, 937 F. Supp. 2d 390, 418 (S.D.N.Y. 2013); *see also Murphy v. GE*, 245 F. Supp. 2d 459, 467 (N.D.N.Y. 2003). Dr. Meggs's opinion suffers from all of these deficiencies.

### A. Dr. Meggs's opinion lacks epidemiological support.

Dr. Meggs is not aware of a single reported case of silicosis-producing silica being created because of the SLS process. (ECF Doc. 68-1 at ¶ 10(iv); Feb. 2016 Aff. at ¶ 9(c).) He cannot explain this void. He demurs that "all we can do is speculate; we really don't know" why the epidemiological evidence is so lacking. (ECF Doc. 68-1 at ¶ 10(iv).)

The same is true for his opinions regarding nylon and resin. The material safety data sheets for Duraform GF and DTM Laserite—the powders Dr. Meggs blames for Mr. Coene's interstitial lung disease—do not state that the powders can cause interstitial lung disease. (Feb. 2016 Aff. at ¶ 9(d).) Dr. Meggs cannot point to any epidemiological study or case report that shows SLS creates respirable silica, nylon, or resin capable of causing lung disease. (*Id.* at ¶ 9(c).) He is candid on this point:

> Q. So . . . what you're telling us is that Mr. Coene is the first ever case that you know of through your experience and the literature where someone has been selective laser sintering and, then, developed an interstitial lung disease caused by either silica, resin or nylon?
>
> A. That's correct.

(*Id.*)

Dr. Meggs claims to be the first person in history to have connected the SLS process to interstitial lung disease. Notably, he has done so while acting as a paid expert witness in litigation. The context of Dr. Meggs's novel "discovery" deserves skepticism and should influence the Court's analysis of the reliability of his opinion. *See, e.g.*, *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 437 (S.D.N.Y. 2005) (reasoning that courts must exclude a theory "that has no little or no empirical support [and] is entirely unaccepted outside the very lawsuit in which the theory is being advanced for the first time"); *Davis*, 937 F. Supp. 2d at 415

(reasoning that the novelty of an opinion "is a basis for skepticism and caution" in analyzing the opinion's admissibility).

**B.     Dr. Meggs knows nothing about SLS.**

This would be an improper case to embrace a novel scientific theory about SLS, because the person promoting the theory, Dr. Meggs, knows nothing about it and has not taken steps to improve his understanding. As explained above, Dr. Meggs does not rely on any articles or data pertaining to the SLS process. (ECF Doc. 68-1 at ¶ 10(iv); Feb. 2016 Aff. at ¶ 9(e).) Instead, he relies on general articles on loosely-related subjects, such as a study of the nylon flocking industry (an industry where workers cut nylon into tiny pieces and glue them back together to create a specific texture) and studies on heating glass in processes *other than* SLS. (*See, e.g.*, *id.*; ECF Doc. 68-1 at ¶ 10(iv).)

As a medical doctor and expert witness, Dr. Meggs has not previously studied SLS or learned facts relevant to his opinion in this case. (Feb. 2016 Aff. at ¶ 9(f).) Other than reading the material safety data sheets for Duraform GF and DTM Laserite, Dr. Meggs has not sought out specific facts to support his views. He does not, for example, even know what kind of resin was in Duraform GF, even though he intends to testify that the resin was an injury-producing substance. (*Id*. at ¶ 9(g).) He has made no attempt to learn anything about Duraform GF or DTM Laserite beyond the information on the material safety data sheets. (*Id*. at ¶ 9(h).)

Critically, Dr. Meggs lacks information on the most important fact to his own theory: temperature. The linchpin of his theory is that the SLS laser at Kodak created extraordinarily high temperatures capable of causing certain chemical reactions, which created toxic, respirable substances. (ECF Doc. 68-1 at ¶ 10(viii).) But, astonishingly, Dr. Meggs does not know what temperatures the SLS process creates (*Id*. at ¶ 10(v).) Because Dr. Meggs does not know

10

whether the SLS process produces a sufficient temperature to cause any particular reaction (much less what that reaction is), he cannot reliably say whether the process catalyzed a chemical reaction to create respirable toxins.

Dr. Meggs simply assumes, without any basis, that the SLS laser at Kodak created the temperatures and chemical reactions that make up his theory. Because this assumption is not connected to the facts by anything more than Dr. Meggs's self-serving assurances, the Court should reject it. *GE v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

### C. Dr. Meggs knows nothing about Mr. Coene's exposures.

Even if Dr. Meggs could somehow get around his lack of knowledge regarding SLS, he also lacks knowledge about the dose and duration of Mr. Coene's exposure to *any* workplace substances. Assuming, for the sake of argument, that SLS could create potentially dangerous and respirable dusts, Dr. Meggs still does not know to what extent the process actually does so, in general, or did at Kodak, specifically.

This lack of knowledge is fatal to Dr. Meggs's opinion because both federal and New York law recognize these facts as essential in all toxic exposure cases. *See Amorgianos v. Amtrak*, 303 F.3d 256, 268 (2d Cir. 2002); *Parker v. Mobil Oil Corp.*, 857 N.E. 2d 1114, 1120-21 (N.Y. 2006); *Barbaro v. Eastman Kodak Co.*, 26 Misc. 3d 1224 (Sup. Ct.—Nassau Cnty. 2010).[4] If an expert does not base his opinion on an exact quantification of exposure levels to a toxin, he must at least have knowledge of the "intensity of exposure," use "mathematical

---

[4] *See also* Federal Judicial Center, Reference Manual on Scientific Evidence, Reference Guide on Toxicology 403 (2d ed. 2000); David L. Eaton, Ph.D, DABT, FATS, *Scientific Judgment & Toxic Torts—A Primer in Toxicology for Judges & Lawyers*, 12 J. L. & Policy 5, 11 (2003).

modeling," or make some comparison "to the exposure levels of subjects of other studies." *Parker*, 857 N.E. at 1121. An expert may not opine on causation based on conclusory statements and conjecture alone. *Id*.

But conclusory statements, not facts, are what Dr. Meggs offers. Although Dr. Meggs thinks Duraform GF and DTM Laserite were the products from which SLS created toxic, respirable dust, he has no idea how often Mr. Coene used one product or another. (Feb. 2016 Aff. at ¶ 9(i).) He concedes "we don't have a dose" in this case, and concedes there is no data showing any respirable crystalline silica was created at Kodak, much less the dose that Mr. Coene might have experienced. (ECF Doc. 68-1 at ¶ 10(v).) Likewise, for nylon and resin Dr. Meggs has no data showing respirable nylon or resin at Kodak, and admits he has no basis to quantify Mr. Coene's exposure to those substances, including the duration of exposure. (Feb. 2016 Aff. at ¶ 9(j).)

Dr. Meggs's analysis falls far short of the analysis described in *Parker*. He does not attempt to address the intensity of exposure, employ mathematical monitoring, or compare the possible levels of Coene's exposures to levels of subjects in other studies. He admits there is no data, and that there are no other such studies. He simply declares, without any basis, that the SLS process created a toxic level of exposure to silica, nylon, and resin. Again, these sorts of self-serving and unsupported declarations are not a sufficient factual basis for expert testimony under Rule 702 or the *Daubert* standard. *Joiner*, 522 U.S. at 146.

### IV. Dr. Meggs's opinion fails all of the *Daubert* criteria.

An expert's opinion must be "the product of reliable principles and methods . . . reliably applied . . . to the facts of the case." Fed. R. Evid. 702. There are five indicia of reliability to consider in determining whether an expert opinion satisfies this standard: (1) testing, (2) peer

review and publication, (3) error rate, (4) controlling standards, and (5) general acceptance in the scientific community. *Daubert*, 509 U.S. at 593-94; *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253-54 (2d Cir. 2005).

Dr. Meggs's opinion fails all five criteria, offering no sign of reliability. His methodology is to recite the unhelpful truism—based on general reference materials—that there is *some* temperature at which non-respirable amorphous silica can be converted into respirable crystalline silica, and *some* sorts of chemical manipulations that could make nylon and resin respirable and toxic. He has done nothing to take that truism and reliably connect it to this case. That is, he has done nothing to demonstrate that in this case, such conversion or manipulation occurred, and that it occurred to such an extent that it more likely than not caused Mr. Coene's alleged injury.

Rather, Dr. Meggs has simply declared—based on his superficial understanding of general principles—that this conversion or manipulation of chemicals is possible. Dr. Meggs's self-serving declaration has not been tested; nor published and subjected to peer review; nor assigned an error rate; nor guided by controlling standards; nor accepted by the scientific community. It is not really a "methodology" at all.[5]

As noted, Dr. Meggs claims to have identified the first case in history of SLS generating toxic exposures and causing someone interstitial lung disease. Despite "discovering" this

---

[5] Dr. Meggs gives his methodology the curious label "differential diagnosis" and says the "methodology of a physician making a diagnosis . . . was used." (ECF Doc. 68-7 at ¶ IV.) This label further shows the unreliability of Dr. Meggs's opinion. What he offers is not a diagnosis of a disease; it is a novel theory that SLS *creates* toxic and respirable silica, nylon, and resin. The "differential diagnosis" label is, therefore, ill-fitting and simply shows that Dr. Meggs is straying from his area of expertise. But even if Coene's diagnosis, as such, were the summary judgment issue, Dr. Meggs concedes that he is not the right person to rule-out alternative causes (*i.e.*, to perform a differential diagnosis). He testified that a board-certified pulmonologist would need to diagnose sarcoidosis (and presumably to rule it out), and he is not a board-certified pulmonologist. (Feb. 2016 Aff. at ¶ 9(k).)

13

extraordinary occurrence, Dr. Meggs himself has chosen not to publish a case report about it to subject his view to the scientific community's scrutiny. (Feb. 2016 Aff. at ¶ 9(a).) His choice is telling, and it undercuts the reliability of his intended testimony.

## CONCLUSION

Plaintiffs' only evidence that SLS created respirable silica, nylon, or resin is Dr. Meggs's testimony. That testimony is plainly inadmissible under Federal Rule of Evidence 702 and *Daubert*. When Dr. Meggs's testimony is excluded, as it must be, Plaintiffs cannot prove that Mr. Coene was exposed to respirable silica, nylon, or resin at Kodak while wearing a 3M 8710 respirator; much less that such an exposure was sufficient to cause his illness. Therefore, Plaintiffs cannot create a genuine dispute of material fact, and 3M is entitled to judgment as a matter of law.

Dated: March 3, 2016

> Respectfully submitted,
> **LAVIN, O'NEIL, CEDRONE & DISIPIO**
> One East Main Street, 10th Floor
> Rochester, NY 14614
> Telephone: (585) 647-5753
> Facsimile: (585) 647-5756
>
> s/Bernadette Weaver-Catalana
> By: BERNADETTE WEAVER-CATALANA
>
> *Attorneys for Defendant 3M Company*