```
               UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF NEW YORK

             FILE NUMBER:  10-CV-6546FPG-MWP
```

ROBERT COENE AND VALERIE    )
COENE,                      )    (C-O-N-T-I-N-U-A-T-I-O-N)
                            )
        PLAINTIFFS,          )     D-E-P-O-S-I-T-I-O-N
                            )
VS.                         )            OF
                            )
3M COMPANY, AS SUCCESSOR BY )    WILLIAM J. MEGGS, M.D.
MERGER TO MINNESOTA MINING & )
MANUFACTURING COMPANY AND/OR )
ITS PREDECESSORS/SUCCESSORS )
IN INTEREST, DTM CORPORATION, )
VALIMET, INC., POTTERS      )
INDUSTRIES, INC., AND       )
ARKEMA, INC.                )
                            )
        DEFENDANTS.         )
* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ON NOVEMBER 16, 2015, AT THE OFFICES OF CAROLINA COURT REPORTERS, 105 OAKMONT DRIVE, SUITE A, GREENVILLE, NORTH CAROLINA 27858.

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF  -  MR. MICHAEL B. MARTIN
                      MALONEY MARTIN, L.L.P.
                      THE CLOCKTOWER BUILDING
                      3401 ALLEN PARKWAY, SUITE 100
                      HOUSTON, TEXAS 77019


FOR THE DEFENDANT  -  MR. KIM J. SVESKA
                      FOLEY, BARON, METZGER & JUIP, PLLC
                      CAMBRIDGE CENTER
                      38777 SIX MILE ROAD, SUITE 300
                      LIVONIA, MICHIGAN 48152

COURT REPORTER     -  GAYE H. PAUL

Page 3

STIPULATIONS: PRIOR TO THE GIVING OF ANY TESTIMONY BY THE WITNESS, IT WAS EXPRESSLY STIPULATED AND AGREED BETWEEN THE PARTIES TO THIS ACTION, THROUGH THEIR RESPECTIVE COUNSEL, THAT:

1. BY NOTICE AND/OR CONSENT, THE CONTINUATION OF THE DEPOSITION OF WILLIAM MEGGS, M.D., WAS TAKEN ON THE 16TH DAY OF NOVEMBER, 2015, BEGINNING AT 12:09 P.M., AT THE OFFICE OF CAROLINA COURT REPORTERS IN GREENVILLE, NORTH CAROLINA, BEFORE GAYE H. PAUL, A COURT REPORTER AND NOTARY PUBLIC IN AND FOR THE COUNTY OF BEAUFORT.

2. READING AND SIGNING OF THE TRANSCRIPT OF TESTIMONY BY THE WITNESS IS NOT WAIVED. CHANGES TO THE TRANSCRIPT MAY BE MADE IN THE WITNESS'S OWN HAND, OUT OF THE PRESENCE OF THE OFFICER, DELINEATED BY PAGE AND LINE NUMBER ON THE ERRATA SHEET TO THE SIGNATURE PAGE.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

EXAMINATION OF THE WITNESS

BY MR. KIM J. SVESKA         PAGES 4 - 49
BY MR. MICHAEL B. MARTIN     PAGES 49 - 56
BY MR. KIM J. SVESKA         PAGES 56 - 58
BY MR. MICHAEL B. MARTIN     PAGES 58 - 60
BY MR. KIM J. SVESKA         PAGE 60

INDEX OF EXHIBITS

DEFENDANTS' EXHIBIT [1] - STATEMENT ON SARCOIDOSIS   PAGE 11

DEFENDANT'S EXHIBIT [2] - CONFIGURONS: THERMODYNAMIC   PAGE 17
    PARAMETERS AND SYMMETRY
    CHANGES AT GLASS
    TRANSITION

DEFENDANT'S EXHIBIT [3] - AFFIDAVIT OF JEFFREY S.   PAGE 20
    MARSHICK

DEFENDANT'S EXHIBIT [4] - AFFIDAVIT OF ROBERT COENE   PAGE 21

DEFENDANT'S EXHIBIT [5] - SUPPLEMENTAL OPINION OF   PAGE 21
    DR. MEGGS

DEFENDANT'S EXHIBIT [6] - JOURNAL OF NON-CRYSTALLINE   PAGE 21
    SOLIDS - Prado Article

Page 4

1  WILLIAM J. MEGGS, M.D., BEING BY ME FIRST DULY
2  SWORN TO SPEAK THE TRUTH, DEPOSES AND SAYS:
3      ON EXAMINATION CONDUCTED BY MR. KIM J. SVESKA:
4      Q. Would you state your name for the record,
5  please?
6      A. William Joel Meggs.
7      Q. Dr. Meggs, as you know, my name is Kim Sveska.
8  I'm here on behalf of 3M Company; I'm going to be taking your
9  deposition today, again. Before we started, you were kind
10 enough to segregate the materials you have brought with you
11 into two piles, one which is more current, or recently
12 reviewed, I understand, and the second pile was the old
13 materials that you have.
14      Let me start with this background. Did you
15 bring a fresh copy of your CV?
16      A. No, but there's been no material changes, maybe
17 a couple of articles or talks added, or abstracts, but
18 nothing that relates to this case.
19      MR. MARTIN: May I?
20      MR. SVESKA: Sure. Go ahead, Mike.
21      MR. MARTIN: There was also a flash drive that I
22 gave him. Did you bring that?
23      DR. MEGGS: (Places flash drive on table.)
24      Q. Do you know what's on that flash drive, Dr.
25 Meggs?

Page 5

1      A. Yes. It's a deposition of, I think Dr. Whysner.
2  There are some CT scan images that, unfortunately, I could
3  not open, because my machine didn't have the right software
4  to download it. There were a few other -- you could open it
5  and you could see it. That might be the easiest. There were
6  about five or six things. I don't have the list memorized,
7  but it was a few of defense expert reports and things.
8      Q. Maybe, when we take a break, I'll use that
9  opportunity to review what's on it, and if need be, I can ask
10 you more questions about it after I do that.
11     A. Okay.
12     Q. So, getting back to the questions where I had
13 just left off, so you've indicated that you haven't had any
14 substantive changes to your CV which would in any way impact
15 upon this case, meaning, for example, you haven't done any
16 research, you haven't published anything, haven't given any
17 lectures relevant to anything related to this case; right?
18     A. Right.
19     Q. How about your practice; is there anything
20 significant in terms of changes to your day-to-day practice
21 of medicine?
22     A. No.
23     Q. Let me take a look at the material you have in
24 front of you, sir.
25     A. Okay.

## Page 6

1  Q. Just pass them over, and I'll take a quick look,
2  and, then, I'll figure out how I want to approach asking you
3  questions.
4  A. The MSDS's are old, but they were attached to
5  that Affidavit.
6  Q. All right, we'll come back to that. What else
7  do you have there, sir?
8  A. A CT scan report of the abdomen in 2009.
9  Q. Just so we're on the same page, this is a June
10  4, 2009 Radiology Report from a Dr. Mark Kahn about Mr. Coene
11  and a abdominal CT?
12  A. That's correct.
13  Q. Is there anything specific about this that you
14  intend to offer any commentary on?
15  A. His spleen was of normal size.
16  Q. Contrasted with the IME, which suggested that it
17  was enlarged?
18  A. That's correct.
19  Q. Anything else that this is relevant to?
20  A. That's why I pulled it out and highlighted it.
21  It's the only documented objective determination of his
22  spleen size that I have found in the records.
23  Q. There weren't any later CT's more close in time
24  to the IME, which I believe was some time in 2013?
25  A. There was a CT of the chest in 2012, and I did

## Page 7

1  not see a report of the spleen size on that CT.
2  Q. You wouldn't expect to see a report of a spleen
3  on a high contrast chest CT, would you?
4  A. You could, because you might catch the spleen.
5  Probably not the whole spleen, if it was enlarged. But the
6  spleen does tuck up under the diaphragm, so you do see, you
7  know, the top of the spleen. And I didn't see them comment
8  one way or another on that report.
9  Q. So, getting to where I was headed, you don't
10  have any subsequent abdominal or other CT's that show one way
11  or the other whether the spleen was enlarged?
12  A. That's correct.
13  Q. All right, let's continue with the materials.
14  Next item is a letter to me dated June 18, 2013, from Dr.
15  Charles White, who is a radiologist. Is this something that
16  you are looking at from a background perspective, since
17  you're not a radiologist?
18  A. Well, the significance of this is the sentence,
19  last sentence into the third last paragraph, "Thus the
20  radiographic features are more consistent with sarcoidosis
21  than silicosis." So that's why I highlighted this. And I
22  also attached the reading of the chest CT that he reviewed,
23  and the chest x-ray that was done the same day, I guess,
24  September 28, 2012.
25  Q. So, again, so I know what commentary, if any,

## Page 8

1  you're going to have on this, this is from a Board Certified
2  Radiologist, who actually looked at the films; is that your
3  understanding?
4  A. That's correct.
5  Q. And the CT's, right?
6  A. Correct.
7  Q. Are you intending to say that you think he got
8  it wrong?
9  A. Yes. My statement would be that it is
10  absolutely impossible for a radiologist to make a diagnosis
11  of sarcoidosis based on comparing two CT scans. The
12  diagnostic criteria for sarcoidosis is very specific. It's
13  the presence on biopsy of noncaseating granulomas, and there
14  can be highly variable patterns in both silicosis and
15  sarcoidosis.
16      These can change with time, and it's just
17  irrelevant, because you cannot make a diagnosis of
18  sarcoidosis. You can give an opinion -- well, in my opinion,
19  I think this favors sarcoidosis over the silicosis, but
20  that's just an opinion. It's different from the opinion of
21  the radiologist who read the film as a treating physician's
22  referral to Radiology. And it's inconsistent with the chest
23  x-ray done on the same day.
24  Q. In your day-to-day practice, you probably do
25  some reviews of CT scans and regular chest x-rays; right?

## Page 9

1  A. All the time.
2  Q. But you're not a Board Certified Radiologist;
3  right?
4  A. That's correct.
5  Q. So you are not allowed to, in the medical
6  setting, offer a formal report opining or -- let me start
7  that over. You're not able to offer a formal report on a CT
8  or a chest x-ray, as would a radiologist; right?
9  A. That's correct.
10  Q. What do we have next?
11  MR. MARTIN: Did you want to add something,
12  Doctor?
13  A. Well, you know, I confer with radiologists all
14  the time, and I have convinced radiologists -- or I have not
15  convinced, but I have discussed cases with radiologists, and
16  they've changed their opinion, and I know the diagnosis of
17  sarcoidosis and I know the radiologist cannot make that
18  diagnosis from a CT scan. And I think any radiologist would
19  agree with that. And, if you just read them, the diagnostic
20  criteria for sarcoidosis, they would say yes, you're right; I
21  can give an opinion it favors one diagnosis over another,
22  based on certain reasons, but I cannot make a diagnosis.
23  Q. What's next?
24  A. This is a follow-up report --
25  Q. You can just hand it to me.

### Page 10

 1    A. -- by me, with attached references.
 2    Q. And we'll get back to that. What else do you
 3  have?
 4        MR. MARTIN: Can we mark it?
 5        MR. SVESTA: We will.
 6        MR. MARTIN: Okay.
 7    A. This is an Affidavit by Dr. Jeffrey Marshick, a
 8  treating physician. And that's dated October 22, 2013.
 9    Q. We'll get back to that. What else do you have?
10    A. This is Plaintiff's Memorandum of Law in
11  Response to Defendants' Galbert Motion and Motion for Summary
12  Judgment.
13    Q. Would it be fair to characterize this in your
14  hands as for academic curiosity as opposed to anything
15  specific in your field and in your opinions?
16    A. In terms of the legal citations, that's
17  absolutely correct.
18    Q. Let's see what you have next.
19    A. Well, this is just a -- this, I think, is not
20  old, but I think it's very important, particularly, with our
21  recent comments. It's The American Thoracic Society Medical
22  Section of the American Lung Association's Statement on
23  Sarcoidosis, which just very briefly states how you make the
24  diagnosis. It's based on a biopsy showing noncaseating
25  granulomas.

### Page 11

 1    Q. This is something that you pulled after your
 2  last deposition?
 3    A. No. I think I had it before. But, in my review
 4  of the file, I felt that was such an important issue, given
 5  that the defense experts are saying or diagnosing
 6  sarcoidosis. Nobody has diagnosed sarcoidosis. The
 7  diagnosis is very specific. It requires a biopsy and very
 8  specific findings on biopsy.
 9        MR. MARTIN: I do think it was produced at the
10  last deposition, though, for the record.
11        MR. MEGGS: Yes.
12    A. But, given the radiology report and so forth, I
13  thought that was such an important issue that I pulled out
14  the first page. I think the full article is in there
15  somewhere, and was an exhibit to the last one.
16        MR. SVESKA: Off the record for a second.
17        COURT REPORTER'S NOTE: (A very brief off-the-
18  record break was taken.)
19    Q. Doctor, we're going to mark this as Exhibit [1]
20  for identification. It's a Statement on Sarcoidosis from The
21  American Thoracic Society. It's Vintage 1999. The quote you
22  are referring to is "The diagnosis is established when
23  clinico-radiological findings are supported by histological
24  evidence of noncaseating epithelioid cell granulomas.
25  Granulomas of known causes and local sarcoid reactions must

### Page 12

 1  be excluded." Did I get that right?
 2    A. That's correct.
 3    Q. Last time I took your deposition, I believe you
 4  said you had seen sarcoid, but it had been many years; is
 5  that accurate, do you remember?
 6    A. No. I saw a -- well, it's not accurate right
 7  now. I saw a case a couple of weeks ago.
 8    Q. Well, I was going to get to it now in a minute.
 9  Do you recall that, in general, you told me at the last
10  setting of your deposition that you had seen sarcoid, but it
11  was certainly not a major focus, and you couldn't remember
12  the last time, or it was a long time ago that you'd seen one?
13    A. I don't recall saying that. But I do see cases
14  from time to time as a treating physician -- not a treating
15  physician of sarcoid, except to treat acute exacerbations.
16    Q. When's the last time you made the actual
17  diagnosis of sarcoid -- lung sarcoid; ever?
18    A. Well, I don't -- I would say never, because I
19  don't read biopsies, and it's diagnosed by biopsy, read by a
20  pathologist. I have seen individuals for whom sarcoidosis
21  would be in the differential diagnosis, and referred them to
22  a pulmonologist.
23    Q. A pulmonologist would be the proper specialty to
24  diagnose lung sarcoid; right?
25    A. That's correct.

### Page 13

 1    Q. And, although I know you are quad-boarded, one
 2  of them is not pulmonology?
 3    A. That's correct.
 4    Q. What's next?
 5    A. This is just some additional things on silicosis
 6  that I don't think I had. It's a couple of Wikipedia
 7  articles that I just pulled for general background
 8  information, and one of these -- and I went to the primary
 9  reference. I don't know The Court's standing on how
10  definitive Wikipedia is. And, just the OSHA thing that had
11  some information in it, I thought was relevant, that I pulled
12  off line. It's really just background on glass and how it
13  behaves, and they just relate to the whole process of --
14    Q. The two items from Wikipedia, one is dated 11-
15  14-2015, titled Devitrification. The other one is of the
16  same date, and it's titled Glass Transition. I think I
17  understand your testimony so far. This was just some
18  background information; you don't intent to rely specifically
19  on anything that's coming to you from Wikipedia?
20    A. Not really, no.
21    Q. Item next is a Frequently Asked Questions
22  Section on something called Silica Advisor, and it appears to
23  be an official publication or web print out from OSHA, US
24  OSHA. It also has an exhibit sticker on it. Do you know how
25  that occurred?

Page 14

1   MR. MARTIN: That was actually from the Whysner
2   deposition.
3   MR. SVESKA: Oh, okay.
4   MR. MARTIN: Which would be on that flash drive.
5   So he must have printed it off there.
6   MR. SVESKA: Thank you for your help.
7   MR. MARTIN: You're welcome.
8   MR. SVESKA: I can't remember what Item 29 was
9   from a dep last week, let alone one, two years ago.
10  MR. MARTIN: The only reason that I know that is
11  because I looked at it yesterday.
12      Q.  So you printed this off?
13      A.  Yes.
14      Q.  Is there anything specific in here that you
15  intend to offer any commentary on?
16      A.  I think there was just a comment in there about
17  -- I think I marked it with a highlighter -- about you have
18  to worry about silicosis if you're removing fiberglass.
19      Q.  To be more specific, I'll see if I can recap
20  what this is saying, and have you fix it, if I don't get it
21  correct.
22      They're talking about removing fire brick,
23  fiberglass or insulation from a furnace that has been in
24  active use, and they're talking about the heating of those
25  elements might have created some silica.  In general, did I

Page 15

1   get that right?
2       A.  That's correct.
3       Q.  So, again, this is more of a background kind of
4   thing?
5       A.  Correct.
6       Q.  Item last in the stack is an article from
7   Entropy, E-N-T-R-O-P-Y, 2008 article entitled Configurons
8   Thermodynamic Parameters and Symmetry Changes at Glass
9   Transitions, by a gentleman named Ojovan, O-J-O-V-A-N.  And
10  it appears to be a fairly detailed scientific article dealing
11  with thermodynamics at glass transition points; did I get
12  that right?
13      A.  Correct.
14      Q.  Do you intend to rely on that in any specific
15  way in this case, or is this also background?
16      A.  It relates to the issue of amorphous glass and
17  crystalline silican forming in it, as you change the
18  temperature, and the pressure, and impurities, and surface
19  boundary areas, all sorts of things.  It's a very interesting
20  article, very instructive.
21      Q.  Again, it provides you with some background, but
22  it doesn't really provide you with the specifics that would
23  apply to this case.
24      MR. MARTIN: Objection.
25      Q.  Is that a fair characterization?

Page 16

1   MR. MARTIN: Objection to form.
2       A.  I'm not sure.
3       Q.  Well, hand it over and let me get more specific.
4       A.  It discussed the physics of these transitions,
5   which is very important to know when you render an opinion.
6   I think it supports that there will be crystalline silica
7   formed at Mr. Coene's work place, and that's Coene,
8   C-O-E-N-E.
9       Q.  Having looked at it now in greater detail, it
10  strikes me that you could be saying that this provides you
11  with some information which suggests that it's possible for a
12  glass to be turned into a crystalline silica form, but it
13  really doesn't provide you with any specifics that would be
14  translatable into this case in particular.  Is that a fair
15  characterization?
16      A.  No.
17      Q.  Okay.  Maybe you can show me, then, what
18  specifically in that article allows you to discuss the -- or
19  allows you to apply what's in that article to this case.
20      A.  Well, this and the other articles demonstrate
21  the physics of what happens to silica when you heat it to
22  different temperatures and subject to different pressures and
23  so forth.  And they support that over a wide range of
24  parameters, even in sintering, that you're going to get
25  crystalline silica formed.

Page 17

1       These "background articles" that may not apply
2   specifically show that in virtually all situations you have
3   some crystalline silican formed as you increase the
4   temperature to very high temperatures, the percent that forms
5   crystalline silica goes away -- doesn't go away -- it is
6   reduced up to, you know, 1,000 degrees celsius or whatever.
7       But you have some formed throughout the
8   spectrum, the parameters that have measured and discussed.
9       Q.  I understand what you just said, and I'm going
10  to come back to where I was headed, and I think maybe we'll
11  agree on this.  This deals with concepts and conceptually
12  that glass can be turned into crystalline silica under the
13  right conditions; right?
14      A.  That it is turned into crystalline silica over a
15  huge range of conditions.
16      Q.  It doesn't apply specifically to selective laser
17  sintering, or now  what's called 3D printing though, does it?
18      A.  I think it does.
19      Q.  All right, well let's mark that as Exhibit [2].
20  Maybe you can show me on what page they mention selective
21  laser sintering or 3D printing.
22      A.  Well, I didn't say they mentioned it.  What I
23  said was they showed it over -- in bulk, these articles show
24  that over a wide range of conditions, even the conditions
25  reasonably expected in this case, that some crystallization

**Page 18**

1  occurs. There's one article in this packet --
2    Q. Well, let's --
3    MR. MARTIN: Let him finish.
4    A. -- that actually shows the percent of sintering
5  -- I mean, that shows the percent of crystallization that
6  takes place with sintering versus temperature. And we know
7  that from Mr. Coene's testimonies that there's a temperature
8  in their temperature ranging things that they did, at which
9  the material becomes fried. And, at that temperature in the
10 experimental studies, you get crystalline glass forming.
11   Q. Again, I get that. But the article that you
12 have in front of you, which is labeled as Defendants' Exhibit
13 Number [2], doesn't get into that level of detail. It gives
14 you some parameters, but it doesn't say this can specifically
15 happen with selective laser sintering.
16   A. Not in this particular article. You're correct.
17   Q. Getting back to your background, sir, since we
18 last talked, have you seen any patients and made the
19 diagnosis of silicosis?
20   A. No.
21   Q. Have you seen a patient that you believe to have
22 been exposed to nylon or glass and developed any sort of
23 disease associated with that, lung disease?
24   A. No.
25   Q. Have you ever made the diagnosis of anyone, with

**Page 19**

1  any patient, having any exposure to nylon or glass and then
2  developed a lung disease?
3    A. No.
4    Q. Have you had any discussions with -- additional
5  discussions with Mr. Coene?
6    A. Yes.
7    Q. Now, I know when we last talked, you had talked
8  to him and obtained some background information, et cetera.
9  I'm excluding that. You've talked to him since that
10 discussion?
11   A. That's correct.
12   Q. When did you talk to him?
13   A. Yesterday.
14   MR. MARTIN: I think you're talking about me.
15   A. Oh, Mr. Coene, I'm sorry. No, I have not had
16 any further discussion with Mr. Coene.
17   MR. SVESKA: Thank you again, Mark. We
18 appreciate your help.
19   Q. Have you had any discussions with any of the
20 treating physicians?
21   A. No.
22   Q. Other than Mr. Martin, have you had any
23 discussion with anyone whatsoever regarding this case? And I
24 don't care if you talked to your wife about being here today;
25 that's not included.

**Page 20**

1    A. You don't care if I talked to Rhonda in his
2  office about scheduling a deposition? No.
3    Q. Have you obtained any information through any
4  source relative to Mr. Coene's current clinical condition as
5  of 2015?
6    A. No. The last report I have is 2013, the letter
7  by Dr. Marshick.
8    Q. Which is the one I looked -- I'm looking at, at
9  the moment?
10   A. That's correct.
11   Q. Which we're going to mark as Exhibit [3]. Do
12 you have any understanding as to Mr. Coene's current clinical
13 status?
14   A. No.
15   Q. Are you planning on offering any opinions as to
16 Mr. Coene's clinical status and his potential prognosis?
17   A. No. I'm relying on his treating physician for
18 those opinions.
19   Q. Is there anything else that you have done
20 relative to this case that isn't embodied in any of the
21 materials that are in front of us?
22   A. This is a paper I put -- that I think is a very
23 important paper for the case, and I don't know if I had it at
24 the time of my deposition. That's why I set it aside.
25   Q. All right, we'll get back to that. My question

**Page 21**

1  was, was there anything else that you did in this case that
2  isn't embodied in some of the materials that are in front of
3  us.
4    A. No.
5    Q. So, for example, there isn't something new
6  through contacting Kodak or some industrial hygienist that
7  was on site at Kodak; right?
8    A. Right.
9    MR. MARTIN: By the way, for the benefit of the
10 record, this article that he just mentioned on the
11 sinterability of crystallizing glass that you guys looked at
12 -- article is something that was produced the first time
13 around.
14   MR. SVESKA: I recognized it.
15   A. I had a copy with no sticker on it, so.
16   Q. Let's mark the Coene Affidavit and the attached
17 MSDS's as Exhibit [4], and we'll come back to that. Let's
18 mark Dr. Meggs's -- can I call this your supplemental
19 opinion?
20   A. Yes.
21   Q. -- as Exhibit [5], including the attachments.
22 And, Sir, if you would hand me the article we just discussed,
23 and let's mark the Prado, P-R-A-D-O, Article in the Journal
24 of Non-Crystalline Solids, entitled, On The Sinterability of
25 Crystallizing Glass Powders, as Exhibit [6].

**Page 22**

Finishing up on the background questions, which I wasn't yet quite done with, do you have any additional cases that you've worked with Mr. Martin on since we last talked?

A. Not active. I don't think I've discussed another case with him. There is one case that I've reviewed files for him in the much -- before I reviewed this file, which I think must be in total inactive status.

Q. In your litigation consulting work, have you run across anything since we last talked that bears any semblance to this case?

A. No.

Q. During your last deposition, I asked you if you had any opinions regarding respiratory protection issues, and I believe you told me that you were not going there. I want to confirm that is still the case.

A. I will leave that to the experts in that area.

Q. Is there anything that you have on your to-do list, and, maybe, the first question there is, like looking at the thoracic CT's, that you haven't done yet?

A. I would like to look at them. I'd probably have to take them into work to open them. But, again, I'm not a radiologist, and I review films with radiologists and may review them with our radiologists. But I will not give my reading of the CT scans. Does that answer your question?

**Page 23**

Q. It totally answered my question. Thank you. But let me just make sure, because it was broader. Is there anything else -- I gave you the CT. Was there anything else that's on your to-do list relative to this case?

A. No. But I would qualify that to say I'm available if Mr. Martin gives me something else to do, such as testify at trial.

Q. I'm going to hand you back what we've marked as Exhibit [5], the Supplemental Opinion and attached articles, and I'm going to go through some of that content with you. So, if you need to look at it, please do so.

The second paragraph relates to identifying that Mr. Coene was using a product called Duraform GF, and DTM Laserite, L-A-S-E-R-I-T-E, nylon. Did I get those right?

A. Correct.

Q. Do you have any idea as to the break down of the use of those products?

A. All I have is Mr. Coene's testimony on that issue. And I think -- it's either in his deposition or in the Affidavit, he talked about the -- you're talking about how much he used each one?

Q. Yes. Let me just get to the -- where I'm headed with this, and, maybe, we don't even need to deal with it, as I'm trying to deal with it. Does it matter to you for any opinions you might hold in the case whether there was a high

**Page 24**

percentage of Duraform GF versus DTM Laserite nylon?

A. Not specifically.

Q. So, even if we were able to quantify it in terms of, let's say that the 80 percent was the nylon and 20 percent was the Duraform, that wouldn't matter in terms of, again, any opinions you hold in this case?

A. That's correct.

Q. Next paragraph you cite to a CDC publication in the Morbidity Mortality Weekly entitled Chronic Interstitial Lung Disease in Nylon Flocking Industry Workers. Did I read that correctly?

A. That's correct.

Q. And, then, a second article is identified from Boag, B-O-A-G, from the American Journal of Surgical Pathology entitled the Pathology of Interstitial Lung Disease in Nylon Flock Workers. Did I read that correctly?

A. That's correct.

Q. Are these articles that you looked up after your first deposition?

A. Yes. And there's a third article that I looked up after this was written.

Q. We'll get to that, if you don't mind. It's stated in here, in follow up to my report and earlier deposition and in light of questioning by defense counsel, that's suggesting that something that you were asked

**Page 25**

triggered this supplemental report; is that what happened?

A. That's correct.

Q. Was there any evidence, from your review of the materials that you had at the time of your August 21st deposition, that someone else had identified, or not identified, for that matter, the potential for there being some nylon flock disease?

A. Not that I recall.

Q. Have you looked at the studies in detail from the MMWR or the American Journal of Surgical Pathology?

A. That's correct. I read the studies.

Q. Did you understand that they were not referring to laser sintering?

A. That's correct.

Q. In fact, they were referring to a process whereby nylon fibers were being cut, physically cut by some type of a cutting device, and that shearing off was creating respirable nylon particles; you gleaned that from those articles?

A. That's correct.

Q. We'll get to how it is that you draw the conclusion that there was a contributing factor, but I want to start with, does this alter in any way your opinion that Mr. Coene had exposure to silica that led to silicosis?

A. No. It had a triple whammy, if you'd like. Or

### Page 26

we could say a triple whammy with a confounder.
Q. Well, let me guess, see if I can get the triple. One being the supplemental, we're talking about the nylon and the resin; right?
A. That's two.
Q. One -- then, I guess one must be the silica, silicosis?
A. Nylon and resin.
Q. So you're counting resin as three?
A. Yes.
Q. Where is smoking in there; is that four?
A. That's the confounder.
Q. I see. What diagnosis do you believe Mr. Coene has?
A. He has interstitial lung disease caused by exposures to crystalline silica, nylon, respirable resins, and, to some extent, smoking. Well, the interstitial lung disease is not caused by smoking. It doesn't cause interstitial lung disease. But he has the component of obstructive lung disease, which can occur with all four of those.
Q. You broke out nylon and resin as separate; right?
A. That's correct.
Q. I get where it says that the DTM Laserite Nylon

### Page 27

was one component. I guess you're referring to the fact that Duraform GF is a combination of glass and resin powder?
A. That's correct.
Q. What is the resin?
A. It's proprietary.
Q. So you don't know?
A. I don't know the specific nature of the resin, the specific chemical.
Q. Do you know what class of chemicals or components would be in that resin?
A. Respiratory irritants.
Q. How can you say respiratory irritants if you don't have any identification of what it is?
A. Well, I know that the class of resins, as a class, cause respiratory irritation. Look at the Material Safety Data Sheet on any resin. Show me an MSDS on a resin that doesn't say it's a respiratory irritant.
Q. Did the Duraform GF MSDS say it was a respiratory irritant?
A. Well, just specifically, what it says, health hazard data: inhalation, dust or vapors may be irritating to the respiratory tract and cause coughing or sneezing.
Q. That's a general statement; that doesn't refer to the fact that it can cause some interstitial lung disease; right?

### Page 28

A. I didn't say the resin caused interstitial lung disease. I said it was contributing.
Q. So we've got a clean record, I was just asking you if the MSDS for that product, the Duraform GF, stated that it could cause interstitial lung disease.
A. No, it does not.
Q. Relative to the comment you just made about a contributing factor, are you planning on offering any quantification as to what the resin or the nylon contributed?
A. Not a specific quantification, but that they can contribute transient or reversible components. That is to say, as he got further away from them, they could be a factor in why he might improve.
Q. Because the materials cited to, for nylon and resin, show that quite a few of the patients improve after they are no longer exposed?
A. That's correct. For example, the nylon, they fall into three groups. A group of complete resolution, a group with permanent pulmonary function abnormalities, but stable symptoms, and a group of progressive decline in pulmonary function. So you have quite a variability in the response to these materials, just as you have a variability in the response to crystalline silicosis.
Q. In the materials you reviewed relative to the nylon and resin component, did they tend to suggest to you

### Page 29

that these are not exposures that require a latent period in order to develop a lung problem? They're actually -- the reports you've seen actually show the workers were still being exposed at the time they developed the disease, right?
A. I would have to -- to answer that question, I would have to look at the paper. My opinion is that they are removed from the exposure, but I would really have to look to see how long the ones with the progressive decline had been removed.
Q. Here's where I'm headed with that, maybe this will help you. And if you need to look at the articles, feel free to do that.
Mr. Coene last worked with -- for Kodak with these products, as I understand it, in 2002. Are you saying that that contributing factor of the nylon and resin continues to present, or are you saying it was a contributing factor at some point in history?
A. I would have to say I don't know to what extent the nylon might contribute, because in the article that looks at the natural history over time, some people had a progressive decline.
So, in Mr. Coene's case, I really can't say if it's going to cause problems down the road, like we know silicosis can. We know people can have a long latency period. I don't know that it's known with nylon workers and

### Page 30

of those people who have persistent pulmonary function deficit, but stable symptoms, I don't know what's going to happen to them in 10 or 20 years. So, I cannot say.

Q. You said in response, nylon; would you include resin in that, as well, that you can't quantify or don't know exactly to what extent there could be a continuing contributing factor at this point?

A. I really can't say in his case. What we do know is that people with exposures to respiratory irritants can be at risk to have problems. In fact, I think one of these articles somewhere mentions a second hit phenomenon, that they may be more susceptible to other irritant exposures down the line. But I really can't render an opinion in an individual patient, of what the probability of that would be.

Q. Including Mr. Coene?

A. That's correct.

Q. So, to the extent the nylon and resin was a contributing factor, as far as you can tell based on what you have, it's all in the past, it's not in the present?

A. As far as I know.

Q. Is there a specific clinical -- well, let me start that over. Since you broke nylon and resin out, let's talk about them separately, but I suspect the answers might be the same. Is there a particular clinical syndrome associated with inhaling respirable nylon dust?

### Page 31

A. No. It's actually variable.

Q. What are the typical findings?

A. Okay, I can read right here in this particular story.

Some cases have persistent interstitial lung disease, despite having left the work place. Some develop hypoxic respiratory failure and secondary pulmonary hypertension 18 and 20 years after diagnosis, respectively. Five cases resolved after leaving the work place.

Compared with resolved cases, persistent cases have lower diffusing capacity of the lung. Among exposed workers employed 14.5 plus/minus 4.7 years, 5 had abnormal chest x-rays, and none at baseline. The prevalence of wheeze increased and so forth. So there's quite a variability in what they observed in this series of patients.

Q. So we're on the same page, you were referring to the Turcotte, T-U-R-C-O-T-T-E, publication out of Chest entitled Flock Workers Lung Disease?

A. Correct.

Q. Is there a particular -- well, strike that. Same answer as to resin?

MR. MARTIN: The resin articles were in your original package.

DR. MEGGS: Right.

MR. MARTIN: They were depos, they're attached

### Page 32

to the deposition.

A. Let me pull that article. I don't know if I brought it, but I should have; I saw it in here yesterday. I saw it yesterday.

Q. Maybe I can help you out while you're looking through the materials, Doctor. Doctor, let me ask you this question; I'm going to refocus this. So would you agree, in general, that the present -- the clinical presentation, whether it's nylon or resin, would be patient specific and variable?

A. That was Exhibit [9], and I'm sure it's in here somewhere.

MR. MARTIN: I've got them all right here.

DR. MEGGS: I think that was another -- I think that was the only article on resin that I had.

MR. MARTIN: For the record, he was referring to Exhibit [9] in his first deposition.

MR. SVESKA: I think I got that. Thank you.

MR. MARTIN: Sorry. I just wanted to make sure it's on the record.

MR. SVESKA: Sure.

A. The reference did not report -- it goes back to what I said about respiratory irritants. They found a respiratory irritant effect; they did not find progressive pulmonary fibrosis in any of their subjects. So what I said

### Page 33

about it being a respiratory irritant, it can cause decrease in FEV1 and other factors. To my knowledge, the resin doesn't cause any long-term latent problems, other than that, that you can have with any exposure with respiratory irritants where there's a phenomenon that the bronchial tree can be what we call remodeled, which would make it more susceptible to infections and other irritant exposures.

Q. We don't have the evidence here that Mr. Coene's respiratory tract has been remodeled, do we?

A. It's definitely been changed, and you can see that on the CT scan. Specifically, remodeling is used to describe specific pathological changes that take place in the airway after irritant exposures. And we don't have any biopsy data on him, so I could not say specifically.

I could say that in my experience with patients who have had "remodeling," and this is something I have studied, I would be very surprised if he didn't meet those pathological criteria.

Q. To be definitive, though, you need to have that specimen and have it analyzed; correct?

A. That's correct. Just like to make a diagnosis of sarcoidosis.

Q. And, to the extent Mr. Coene does have remodeling, there's no evidence that you've seen that that has impacted him; right?

## Page 38

COURT REPORTER'S NOTE: An off-the-record break was taken from 1:21 P.M. until 1:30 P.M.

ON CONTINUED EXAMINATION CONDUCTED BY MR. SVESKA:

Q. While we were on our short break, I fired up my laptop computer and put that thumb drive in, and I now have access to the materials that you were talking about. So I'm going to hand my computer over to you, and I really just want to know the answer to this question. Is there anything, specifically, in this thumb drive, that we don't have elsewhere, that you intend to specifically rely on for any opinions you hold?

A. No.

Q. Thank you. That makes it much easier. Did you re-read your deposition from August 21, 2013, in the recent history?

A. Saturday night.

Q. Your opinion regarding silica, as expressed in that deposition, is still your current opinion in this case?

A. Correct.

Q. Have there been any scientific articles published since -- that you're aware of, since August 21, 2013, that relate to laser sintering causing silica, and that silica to be respirable, and then causing disease?

A. No.

## Page 39

Q. So that testimony you gave in August of 2013 on the issue of what literature existed or didn't exist is still current as of today?

A. Yes.

Q. Our Exhibit [4] -- no, I'm sorry. This is [4]. Where is your Affidavit, or your supplemental?

MR. MARTIN: Supplemental report?

MR. SVESKA: Right.

A. This is the stack.

Q. There we go.

A. It's on the bottom of the stack of the attachments.

Q. Thank you. Relative to this supplemental opinion, the materials that you've attached are the relevant materials dealing with this subject matter?

A. For the supplemental report, yes.

Q. Relative to the supplemental report and the nylon and resin exposure piece, do you have any scientific literature, that we haven't yet looked at or talked about, that expresses the opinion that laser sintering causes respirable nylon or resin, which, then, goes on to cause some sort of a disease?

A. I believe this is the most pertinent article. But I believe it was Exhibit [6].

MR. MARTIN: Is that Exhibit [6] to this

## Page 40

deposition or the previous?

DR. MEGGS: To the previous.

MR. SVESKA: No. That's to this. It's got an original sticker.

DR. MEGGS: Wasn't this in -- I think this was an earlier Exhibit [2].

MR. SVESKA: It was. It may have been, yes.

Q. Let me re-ask the question, because I want to make sure it's clear. Relative to selective laser sintering used in Kodak by Mr. Coene, do you have any articles that show that that process creates respirable nylon or resin -- I should say and/or resin, which leads to some disease process?

A. No. With the caveat that the lungs don't care how the particles are produced. If you heat it in the oven or heat it with a laser, they don't care.

Q. And we don't have anything from the work place in this case showing any -- the presence of any respirable nylon or resin; right?

A. To my knowledge, there was no monitoring or exposure levels measured.

Q. Did you get ahold of anybody at the company that makes the Duraform GF or the DTM products --

A. No.

Q. -- in respect to any opinions you might hold in this case?

## Page 41

A. No.

Q. Are you aware of any research they've done that suggests that either of those products can cause any lung disease?

A. No.

Q. There's never been -- and, of course, I know the answer to this question, but I just want to get -- there's never been an epidemiological study done, as you understand it, in any group of laser sinterers, showing that they developed any type of a lung disease associated with any exposures in their field of laser sintering; right?

A. That's correct.

Q. As it pertains to the nylon and resin, we don't know what, if any, dose was provided to Mr. Coene?

A. That's correct.

Q. We don't know the duration or the quantification of any exposure of those two items?

A. That's correct.

Q. And, if we were to pull out -- strike that. Let me lay the foundation. As a medical toxicologist, you're obviously aware of the Bradford Hill Criteria?

A. Yes.

Q. If we were to do an analysis of the nylon and resin exposure using the Bradford Hill Criteria, basically, we wouldn't be able to, would we, because there's no specific

11 (Pages 38 to 41)

Carolina Court Reporters, Inc.
Greenville, North Carolina

### Page 42

1  evidence of the elements under the Bradford Hill Criteria?
2      MR. MARTIN: Objection to form.
3      A. Well, the first thing I'd say is the Bradford
4  Hill Criteria is a criteria for epidemiological studies, and
5  they are suggested criteria. And they are not the criteria
6  for making a diagnosis in an individual patient. They're
7  criteria for the statistical weight in making a diagnosis,
8  making the strength of association in epidemiological
9  studies.
10     Q. So, the answer is, you would not be able to
11 apply the Bradford Hill Criteria, under these circumstances,
12 to Mr. Coene's exposure to nylon and/or resin?
13     A. That's generally the case, yes. You would need
14 supporting data, which is animal studies and all sorts of
15 things.
16     Q. You'd need some published literature, and there
17 is none relative to exposures like we're discussing here,
18 where a laser sinterer allegedly gets exposed to respirable
19 nylon or resins and causes a disease. That's never been
20 reported in the medical literature.
21     A. To my knowledge, nobody's reported Mr. Coene's
22 case, or any other cases.
23     Q. And you didn't write up Mr. Coene's case, I'm
24 assuming?
25     A. No.

### Page 43

1      Q. So there's zero published literature expressing
2  the opinion that laser sintering creates respirable nylon
3  and/or resin which leads to a disease?
4      A. Well, again, the -- how you heat a material
5  doesn't matter, and what the laser does is heat the material.
6  So we do have data on --
7      Q. Well, let me ask --
8      MR. MARTIN: Were you finished?
9      MR. SVESKA: Yes, I don't want to interrupt you.
10     MR. MARTIN: I thought you were pausing for a
11 second, but I was looking down, so.
12     A. Well, I'll yield the floor to you. Go ahead.
13     Q. All right. And I'll help you out. Do we have
14 any data, since you mentioned the word data, to show
15 objectively that laser sintering causes the formation of
16 respirable nylon and/or resin particles?
17     A. No. The data we have shows that sintering can
18 cause the formation of crystalline silica. Now, in the
19 experiments, they didn't use lasers to produce the changes,
20 but the silican molecules don't care how you zap them.
21     Q. Sure. And let me just say this to make sure
22 that we're clear. I had a chance to ask you hours worth of
23 questions at your last deposition focused on silica. And,
24 so, right now, I'm trying to only focus on nylon and resin,
25 so I don't repeat myself, and you don't have to repeat

### Page 44

1  yourself. Okay?
2      MR. MARTIN: I didn't get that. I thought you
3  were back at square one.
4      MR. SVESKA: No way. This is all focused.
5      A. Okay.
6      Q. So let me repeat the question.
7      A. And my apologies. I took it more generally.
8      Q. Is there any data, objective data, that you're
9  aware of, which shows that selective laser sintering of the
10 products we've discussed create respirable nylon and/or
11 resin?
12     A. No.
13     Q. And, again, this is a little redundant, my
14 apologies. And there's no published literature showing that
15 selective laser sintering creates respirable nylon and/or
16 resin which, then, leads to some lung disease down stream?
17     A. That's correct.
18     Q. Have you looked at any MSDS, Material Safety
19 Data Sheet, for the products that we're discussing, that says
20 either of these products can cause the production of
21 respirable nylon and/or resin from laser sintering?
22     A. They don't explicitly say that. They say that
23 it's an inhalational hazard. So, indirectly, they say that.
24     Q. When I asked you the series of questions a
25 couple of minutes ago about selective laser sintering causing

### Page 45

1  respirable nylon or respirable resin, I want to change that
2  rubric for just a minute and ask you the same types of
3  questions, but slightly different.
4      Is there any evidence that you've seen in the
5  published literature, MSDS's, any materials that you've
6  obtained, that supports that inhaling raw respirable either
7  nylon or resin, essentially off gasses from the powder itself
8  -- have you seen anything that supports that?
9      MR. MARTIN: Objection to form.
10     A. You mean if we had a block or pot of the
11 material Duracef GF, or whatever, in this room, would we have
12 a respiratory exposure?
13     Q. No. Let me give you the attorney -- the fun
14 attorney analogy. If I held a 5-pound bag of these products
15 up above this table and dropped them on this table, and there
16 was a cloud of stuff that emanated from that, from that
17 dropping, has anybody ever published or suggested that A)
18 there is respirable nylon or resin in there, and B) that that
19 leads to some disease process in the lung?
20     A. Well, first, if you did this, I would run and
21 hold my breath. And you said if it produced a cloud of dust.
22 That's going to be inhaled, you know. Now, I don't know if
23 anybody's ever published I dropped a bag, 5-pound bag of
24 Duracef GF on a table and measured the dust.
25     I think that would be a funny experiment to do,

**Page 50**

1  formulating a differential diagnosis, considering
2  possibilities, for example, is this silicosis, is it nylon
3  flock workers's disease, is it sarcoidosis, is it lung
4  cancer. And, then, you arrive at a diagnosis considering
5  what's known about the materials and what diseases they can
6  cause, and how they align with the person's illness.
7      Q. As a physician and a toxicologist who may
8  evaluate people's toxic exposures in a clinical setting, what
9  kind of causation information do you generally have to rely
10 upon?
11     A. Well, you rely upon the textbooks of medicine
12 and the collective clinical experience of physicians, and the
13 medical literature that supports this collective information.
14 In more advanced issues, such as, does cigarette smoking
15 cause lung cancer, you can rely on epidemiological studies,
16 you can rely on animal models. But you use the data you have
17 to arrive at an opinion.
18     Q. In terms of the data that you have to arrive at
19 an opinion with regard to an individual patient like Mr.
20 Coene, is it normal for a physician to rely upon the exposure
21 history provided by the patient?
22     A. Yes.
23     Q. Why is that important?
24     A. Well, that's the -- you know, in medical school,
25 they say history is 90 percent of your diagnosis. And where

**Page 51**

1  the person worked, what he did at work, what he was exposed
2  to, the whole description is very important.
3      Q. Do you have to perform a Bradford Hill Criteria
4  analysis before you can make an individual diagnosis based
5  upon a patient's work history and exposure history as
6  compared to the medical literature?
7      A. No.
8      Q. And why is that?
9      A. Because it's not -- again, it's the criteria for
10 epidemiological studies, not for arriving at a diagnosis in
11 an individual patient.
12     Q. In terms of arriving at a diagnosis in an
13 individual patient, you've had the opportunity to review
14 Defendant's Exhibit [4], the Affidavit of Mr. Coene with the
15 attached exhibits, the MSDS Sheets?
16     A. That's correct.
17     Q. And when you have the opportunity, as a
18 physician, to gain additional exposure information such as
19 MSDS Sheets, that's helpful; right?
20     A. Yes.
21     Q. If we look at the MSDS Sheets for Duraform GF,
22 and I think the Laserite Nylon -- I'll hand those to you,
23 which are attached to the Affidavit -- do those two MSDS
24 Sheets describe the form of this substance, how it's
25 presented to the user?

**Page 52**

1      A. Yes.
2      Q. And what is the form?
3      A. Well, it's powder.
4      Q. And do powders traditionally have inhalational
5  hazards associated with them?
6      A. Yes.
7      Q. Are inhalational hazards identified in both of
8  these MSDS Sheets?
9      A. Yes.
10     Q. Do these MSDS Sheets make a recommendation as to
11 what precautions to take against the inhalational hazards?
12     A. Yes.
13     Q. What do they recommend?
14     A. A Niosh approved respirator for dust, mist and
15 fumes, appropriate to the airborne concentration.
16     Q. What was your understanding as to whether Mr.
17 Coene used a Niosh approved respirator?
18     A. My understanding is he did not.
19     Q. You reviewed his deposition; do you know whether
20 he wore respiratory protection?
21     A. I believe, from his deposition, he wore a 3M
22 mask that wasn't approved for fumes. But, again, I'll leave
23 that to the expert on respirators to discuss exactly how good
24 that respirator was for the dust, fumes and mist.
25     Q. Fair enough. Now, in -- as a clinician,

**Page 53**

1  physician and a toxicologist, when you identify a patient
2  who's working with powder that's respirable, that requires
3  respiratory protection such as in Bob Coene, are those the
4  kinds of typical things that toxicologists and physicians
5  look at to identify whether there's an inhalational hazard?
6      A. Yes.
7      Q. Does a toxicologist have to be able to find an
8  epidemiological study on laser sintering before he can
9  determine whether or not a person operating and using a laser
10 sintering device has an inhalational hazard?
11     A. No.
12     Q. How come?
13     A. Well, you have the Material Safety Data Sheet
14 stating that it's an inhalational hazard. You have the
15 description of what happened to Mr. Coene. Again, going
16 back, you look at the exposures, you look at what the disease
17 process is, and whether or not the exposures could produce
18 the disease. It's not a quantitative process. I think we
19 discussed that in my first deposition. You have a dose
20 response curve, and some people get the disease at a much
21 lower dose, and other people remain healthy with even a
22 higher exposure.
23     Q. Is that the discussion in the Murray-Nadal Text
24 that you brought to your first deposition?
25     A. They do discuss, I believe, with regard to

## 54

crystalline silica, that you can't use the standards and quantitatively make a diagnosis. The criteria for diagnosing silicosis is a history of exposure and radiographic evidence consistent with silicosis. That is the criteria for making a diagnosis.

Q. And did Mr. Coene meet that criteria?
A. Yes.
Q. And that opinion is based upon reasonable medical probability?
A. Yes.
Q. The -- one question you answered to Kim, and I don't know if I remember exactly the specific answer, but you said there may not be any epidemiological studies on laser sintering; there are studies on the underlying agents associated with that laser sintering; do you recall that answer?
A. I do recall having that opinion and stating it.
Q. And so, if I could follow up on that, when we're talking about the underlying agents associated with laser sintering in the studies that you looked at, what kind of studies, and with regard to what agents, are you looking at?
A. Well, with regard to the crystalline silica, we have good studies that show that when you take --
MR. SVESKA: Let me place an objection. And I don't want to interrupt, but I don't know -- Mr. Martin is

## 55

not necessarily asking you inappropriate questions. But my concern was to try to stay focused on nylon and resin as part of the supplemental new opinion, and not re-plow all the silica stuff. But go ahead.
MR. MARTIN: Just trying to clear up the Bradford Hill question.
MR. SVESKA: Then, I'm just throwing my objection out there.
Q. Go ahead, Doctor.
A. Well, back to silica, we have very good data to indicate that heating amorphous silica will produce crystalline silica at a huge range of temperatures and pressures. We have the description that there was dust generated before and after this heating process, so, I don't think that's really an issue.
We also have data that says it's almost impossible to produce pure amorphous silica.
Q. Without -- what do you mean by pure amorphous silica; what would make that --
A. Without some crystalline silica in it.
Q. In the context or this Bradford Hill question and this line of questioning you that I have been engaging in, did the literature that you brought to your first deposition that we've kind of touched on here identify industries associated with glass and/or fiberglass as being

## 56

the kinds of industries that are at risk for silicosis?
A. That's correct.
Q. And so, while laser sintering may not be a specific -- there may not be specific epidemiological studies on laser sintering because that industry deals -- or at least that job task deals with melting glass and/or fiberglass, are there representative exposure studies in the literature identifying causation of silicosis in those industries?
A. Yes. According to the textbooks; that's textbook information.
MR. MARTIN: I think that's it.
ON EXAMINATION CONDUCTED BY MR. KIM J. SVESKA:
Q. A few follow up. Do you know when Mr. Coene was first laser sintering?
A. I have that in the record, yes. I've seen a couple of different numbers, but 1992 came about. But I think -- I have it in here, specifically.
Q. No, don't bother to look back.
A. Yes.
Q. I can make this much easier than that. Let's just say it was '95, just so I can do the math very easily. That's 20 years between '95 and 2015; right?
A. Correct.
Q. So, in that entire time, has there ever been a single case report that says laser sintering causes the

## 57

release of respirable silica, nylon or resin, which leads to a disease?
A. I haven't seen a case report on that.
Q. And that would be one of the lowest levels in terms of the hierarchy of, shall we say evidence, medical evidence, scientific evidence of a disease being caused by an exposure, that would be considered the low level; right?
A. In terms of published literature, yes.
Q. Have you ever been to a meeting, a toxicology meeting or other meeting, where it has been suggested or a case presented or a poster presented, where someone said laser sintering triggers respirable nylon, resin or silica that leads to disease?
A. No.
Q. And, of course, that scenario is not present in any type of a textbook, as far as you know, either; right?
A. That's correct. Where you've generated the crystalline silica by laser sintering. There are analogous processes by which it's been generated.
Q. Well, we talked about that, analogous process, at length during your last deposition. That's still accurate as of today; right?
A. Correct.
Q. So, to maybe understand this completely, what you're telling us is that Mr. Coene is the first ever case